Case No. 24-3230

---

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

STEPHANIE SOLIS

Plaintiff-Appellant

v.

THE OHIO STATE UNIVERSITY
WEXNER MEDICAL CENTER

Defendant-Appellee

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

BRIEF OF APPELLANT STEPHANIE SOLIS

---

Ellen M. Kramer (0055552)
emk@crklaw.com
Jason R. Bristol (0072989)
jbristol@crklaw.com
COHEN ROSENTHAL & KRAMER LLP
3208 Clinton Avenue
Cleveland, Ohio 44113
(216) 815-9500 [Tel.]
(216) 781-8061 [Fax]
*Attorney for Appellant*

Oral Argument Requested

# UNITED SATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **STEPHANIE SOLIS** | ) | **CASE NO. 24-3230** |
| | ) | |
| **Plaintiff-Appellant** | ) | |
| | ) | **APPEAL FROM THE UNITED** |
| **v.** | ) | **STATES DISTRICT COURT** |
| | ) | **FOR THE NORTHERN** |
| **THE OHIO STATE UNIVERSITY** | ) | **DISTRICT OF OHIO, EASTERN** |
| **WEXNER MEDICAL CENTER** | ) | **DIVISION** |
| | ) | **CASE NO.: 2:23-CV-01390** |
| **Defendant-Appellee** | ) | |
| | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |

---

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

---

Pursuant to 6th Cir.R. 26.1, Stephanie Solis makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

   No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   No.


/s/ Ellen M. Kramer                  05/23/2024
Ellen M. Kramer (0055552)            Date
Attorney for Appellant

# <u>TABLE OF CONTENTS</u>

**DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST** ......................................................................... ii

**TABLE OF CONTENTS** ....................................................... iii

**TABLE OF AUTHORITIES** ................................................... vi

**APPELLANT'S BRIEF** ..............................................................1

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** ..................1

**STATEMENT OF JURISDICTION** ...........................................1

**STATEMENT OF ISSUES** .........................................................1

**STATEMENT OF THE CASE** ....................................................3

**OVERVIEW OF APPELLANT'S CLAIMS** ................................4

**STATEMENT OF FACTS** ..........................................................5

    **A.**    **Solis's professional background** ..............................5

    **B.**    **Different hiring experiences for white APP candidates** ......................6

    **C.**    **Farah's questionable credibility** .............................6

    **D.**    **Hiring process for APP Ross Heart** ........................9

    **E.**    **Suspicious timing of the purported legitimate business reasons of LVAD experience and recent graduation** ...........................................12

    **F.**    **OSU's dismal hiring of African American APPs** ...............................14

G.      **Expert opinion with respect to a statistically significant difference between the expected and actual number of African American APPs**................................................................................16

**STANDARD OF REVIEW**...............................................................17

**ARGUMENT** .................................................................................18

A.      **Despite conflicting evidence and several examples of Ajwad Farah's questionable veracity, the District Court accepted the entirety of Farah's testimony as credible, thereby holding that Solis did not show pretext.** ...............................................................21

    1.    **LVAD experience.** ..........................................................22

    2.    **Recent APP graduate.** ...................................................24

    3.    **Farah's credibility on the reason Wade was hired is questionable.** .25

B.      **The District Court erred when it found that Solis's circumstantial evidence was "not enough" to raise a genuine issue of material fact.**...............................................................25

    1.    **The District Court erred in finding that the statistical evidence presented by Solis was insufficient.** ...............................26

    2.    **The District Court ignored evidence that white APP candidates were hired much more quickly than African American APP candidates.**...............................................................30

    3.    **The burden imposed by the District Court with respect to OSU's use of subjective criteria was too rigorous and not based on current law in this Circuit.** ...............................................................31

**CONCLUSION**...............................................................34

**CERTIFICATE OF COMPLIANCE**...............................................................36

**CERTIFICATE OF SERVICE** ...............................................................37

iv

**ADDENDUM** .......................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Ameritech Services, Inc.*, 231 F.3d 414 (7th Cir. 2000)............................28

*Aday v. Westfield Ins. Co.*, No. 21-3115, 2022 WL 203347 (6th Cir. Jan. 24, 2022)

.............................................................................................................32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................17

*Barnes v. GenCorp., Inc.*, 896 F.2d 1457 (6th Cir. 1990) ........................................26

*Braithwaite v. Dept. of Homeland Security*, 473 Fed.Appx. 405 (6th Cir. 2012).....21

*Briggs v. Univ. of Cincinnati*, 11 F.4th 498 (6th Cir. 2021) .....................................19

*Browning v. Dep't of the Army*, 436 F.3d 692 (6th Cir. 2006) ........................... 18, 20

*Driggers v. City of Owensboro, Ky*, 110 Fed. App'x 499 (6th Cir. 2004) .. 25, 26, 27, 28

*George v. Youngstown State Univ.*, 966 F.3d 446 (6th Cir. 2020)................ 16, 17, 30

*Grano v. Dep't of Dev.*, 699 F.2d 836 (6th Cir. 1983) ...............................................30

*Griffin v. Finkbeiner*, 689 F.3d 584 (6th Cir. 2012) ........................................... 18, 20

*Hazelwood School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).....................................................................................................28

*Hedrick v. Western Reserve Care Sys.*, 355 F.3d 44 (6th Cir. 2004).........................32

*Helphenstine v. Lewis County, Kentucky*, 60 F.4[th] 305 (6th Cir. 2023).....................16

*Hopkins v. Canton City Bd. Of Educ.*, 477 F. App'x 34 (6th Cir. 2012) 25, 26, 27, 28

*Hopson v. DaimlerChrysler, Corp.*, 306 F.3d 427 (6th Cir. 2002)............................26

*Klepper v. First Am. Bank*, 916 F.2d 337 (6th Cir. 1990) .........................................20

*Levine v. DeJoy*, 64 F.4th 789 (6th Cir. 2023)............................................... 19, 31, 32

*Martin v. Saginaw County Road Comm'n*, 606 F.Supp.3d 639 (E.D. Mich. 2022) 17

*Moffat v. Wal-Mart Stores, Inc.*, 624 Fed.Appx. 341 (6th Cir. 2015) .......... 17, 18, 20

*Muhammad v. Close*, 379 F.3d 413 (6th Cir. 2004) ........................................... 17, 29

*Ramirez v. Hoffman*, 619 F.2d 442 (6th Cir. 1980) ....................................................30

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000) .31

*Reynolds v. Chipotle Mexican Grill, Inc.*, 120 F.Supp.3d 704 (S.D. Ohio 2015).. 30, 31

*Sandman v. New York Times Company*, 78 F.4th 319 (6th Cir. 2023) .......................16

*Scoggins v. Board of Ed. of Nashville, Arkansas Public Schools*, 853 F.2d 1472 (8th Cir. 1988) .................................................................................................28

*Scott v. Eastman Chemical Co.*, 275 Fed.Appx. 466 (6th Cir. 2008) .......................32

*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 55 (6th Cir. 2004) ........................17

*Stokes v. Detroit Pub. Sch.*, 897 Fed. Appx. 493 (6th Cir. 2020)...................... 19, 21

*Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603 (6th Cir. 2003) ..............19

*Thompson v. Fresh Products, LLC*, 985 F.3d 509 (6th Cir. 2021) .................... 19, 21

*Thurman v. Yellow Freight Sys.*, 90 F.3d 1160 (6th Cir. 1996) ................................32

*Tillotson v. Manitowoc Co., Inc.*, 727 Fed.Appx. 164 (6th Cir. 2018).....................32

*Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012) .......................................19

*White v. Baxter Healthcare Corp.*, 553 F.3d 381 (6th Cir. 2008) ...................... 19, 31

*Willard v. Huntington Ford, Inc.*, 952 F.3d 795 (6th Cir. 2020) ................. 17, 20, 33

*Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634 (6th Cir. 2015) .............30

**Statutes**

Title VII of the Civil Rights Act of 1964, § 701, et seq., 42 U.S.C. § 2000e et seq..4

**Rules**

Civ.R. 56.....................................................................................................................33

## APPELLANT'S BRIEF

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument should be scheduled in this case to assist this court in reaching a full understanding of all relevant issues and underlying facts. Oral arguments will also conclusively demonstrate the errors in the district court's decision, including by granting summary judgment despite sufficient evidence of the type which this Court has held to constitute evidence of pretext sufficient to overcome summary judgment. Oral argument would also allow the attorneys for the parties to address what, if any, outstanding factual or legal issues this Court wishes to consider.

## STATEMENT OF JURISDICTION

The Opinion and Order Granting Defendant's Motion for Summary Judgment is unreported and in the Electronic Court Filing system. Opinion, RE 34. The judgment of the United States District Court for the Southern District of Ohio was entered on March 7, 2024. Judgment, RE 35. Appellant Stephanie Solis ("Solis") timely filed her appeal on March 18, 2024. Notice of Appeal, RE 36. The jurisdiction of this Court is invoked under 28 U.S.C. § 1291. This appeal is from the final judgment of the District Court disposing of all claims in this case.

## STATEMENT OF ISSUES

I.    Was it error to make witness credibility judgments in favor of Appellee The Ohio State University Wexner Medical Center ("OSU") as to whether

1

the proffered reasons by OSU for Solis's non-selection in favor of a Caucasian candidate were pretext for race discrimination?

II.   Was it error to find that the statistical evidence presented by Solis did not raise an issue of material fact when the evidence was an expert finding that the difference between the expected and actual numbers of African American Advance Practice Providers ("APP"s) employed at OSU was so large that it could not be due to random chance and there was no contrary evidence?

III.  As inferences are required to be made in favor of the non-moving party, was it error to find that the statistical evidence offered by Solis was insufficient because OSU does not require job applicants to disclose their race?

IV.   Was it error to find that Solis did not provide sufficient independent circumstantial evidence of pretext when the District Court completely ignored evidence that Solis applied for nearly 90 APP positions without being hired for a single one, while several white APP applicants were hired after applying for less than ten?

V.    Was it error to find that the relevant labor market for APPs was the greater Columbus area when the moving party presented no evidence on this material question of fact?

VI.    Was it error to find that Solis's statistical evidence was insufficient because it did not include information on the number of African American APPs in the greater Columbus area?

## STATEMENT OF THE CASE

In September of 2022, prior to filing this case, Solis submitted a charge to the Ohio Civil Rights Commission alleging that she had been discriminated against when OSU failed to offer her two separate APP positions.  By operation of Ohio law, Solis's charge was dual filed with the Equal Employment Opportunity Commission.

Solis was issued notices of Right to Sue by both the OCRC and EEOC, and on April 21, 2023, Solis filed a complaint in the United States District Court for the Southern District of Ohio alleging that she was unlawfully discriminated against based on her race when she was not selected for these APP positions.  Complaint, RE 1.  OSU subsequently filed a Motion for Summary Judgment ("MSJ"), and Solis filed an opposition to the request for summary judgment.  Motion for Summary Judgment, RE 25; Brief in Opposition, RE 29.  OSU filed a reply in support of its MSJ.  Reply, RE 30.  On March 7, 2024, the District Court issued an Opinion and Order Granting OSU's Motion, and also entered a judgment terminating the action pursuant to Fed.R.Civ.P. 58.  Opinion, RE 34; Judgment, RE 35.  Solis filed a Notice of Appeal on March 18, 2024.  Notice of Appeal, RE 36.

## OVERVIEW OF APPELLANT'S CLAIMS

Solis, who is African American, brought this action alleging she was discriminated against in violation of Title VII of the Civil Rights Act of 1964, § 701, et seq., 42 U.S.C. § 2000e et seq., when OSU selected a non-minority for two APP positions to which Solis had applied.

The District Court found that Solis established prima facie cases of race discrimination on her claims that she was not promoted to APP Ross Heart position JRN R26560 ("APP Ross Heart") and APP Vascular Surgery position JRN 46367 ("APP Vascular Surgery"). Opinion, RE 34, Page ID # 1577, 1579. The District Court ultimately ruled, however, that OSU was entitled to summary judgment as Solis failed to present sufficient evidence that the proffered reason for Solis's non-selection was pretext for discrimination. *Id*.

On appeal Solis contends that the District Court erred as a matter of law in granting summary judgment to OSU on her claim related to the APP Ross Heart position as there are triable issues of material fact that OSU's proffered reasons for not selecting Solis were mere pretext for discrimination. Solis attempted to show that OSU's legitimate business reason was pretextual, but the District Court found against her, stating that the "weight of the circumstantial evidence" she presented was not enough to establish a genuine issue of material fact. *Id.* at 1582.

4

## STATEMENT OF FACTS

### A. Solis's professional background

Solis has been a reliable, well-regarded staff nurse for OSU since 2011.  Solis Declaration, RE 27, Page ID # 1485.  On all of Solis's annual performance evaluations between 2017 and 2021, Solis's overall rating "exceeded expectations." *Id.*  In the more than twelve years Solis has been employed by OSU, she has been disciplined on a single occasion - in 2016 for tardiness.  Solis Deposition Transcript, RE 24, Page ID # 1086.

In the hope of furthering her medical career, Solis attended school to obtain her Masters in Nursing while she was working full-time at OSU.  Solis Deposition Transcript, RE 24, Page ID # 994.  Solis became a Certified Nurse Practitioner in late 2018, and began applying for APP positions in early 2019.  Solis Declaration, RE 27, Page ID # 1485.  As a result of not being hired as an APP by OSU in 2021, Solis has incurred damages more than five hundred thousand dollars ($500,000).  Rosen Declaration, RE 26, Page ID # 1445.

Throughout the Plaintiff's tenure at the University, she has primarily worked on the 5th Floor of the Ross Heart Hospital ("Ross"), although she has worked on numerous occasions on the 4th and the 6th floors of Ross.  Solis Declaration, RE 27, Page ID # 1483.  Four and Five Ross both care for post-operative and surgical heart patients.  *Id.*  Five Ross also cares for lung transplant patients, while Four Ross also

treats heart transplant patients. *Id.* Six Ross does not handle surgical patients. Rather, Six Ross focuses on heart failure patients, including patients needing Left Ventricular Assist Devices ("LVAD's). *Id.* The Plaintiff has experience with open heart surgery patients as well as peripheral vascular experience. Mapes Deposition Transcript, RE 21, Page ID # 595; McLaughlin Deposition Transcript, RE 23, Page ID # 809.

## B. Different hiring experiences for white APP candidates

OSU categorizes Nurse Practitioners and Physician Assistants together as APPs. Mapes Deposition Transcript, RE 21, Page ID # 558. Since becoming a Nurse Practitioner in late 2018, Solis has applied for almost ninety APP positions at OSU. Solis Declaration, RE 27, Page ID # 1500-1501. Not a single one of the APP positions to which Solis has applied has been offered to her. *Id.*

Caucasian APPs at OSU have had completely different hiring experiences. In late 2021, Caucasian APP Daniel Wade was offered the sixth APP position to which he applied, while Caucasian APPs Joe Eyer and Megan Fehrenbach were both offered an APP position on their fifth attempts. McDougle Deposition Transcript, RE 22, Page ID # 760.

## C. Farah's questionable credibility

Farah, a Physician Assistant who has been an APP manager at OSU since May of 2019, is the leader of a team that reviews applications and interviews candidates

for open APP positions at the University's Ross Heart Hospital. Farah Deposition I Transcript, RE 19, Page ID # 313. Farah did not hire any African American APPs in the three-and-a-half years between the time he started in his manager position in May of 2019 and December of 2022. *Id.* at 320-321, 325. After learning about Solis's OCRC race discrimination charges, Farah suddenly hired two African American APPs. *Id.* at 320-321.

Farah was deposed in this proceeding and also verified some of the University's written discovery responses. There are numerous inconsistencies in Farah's testimony and discovery responses.

For example, on August 28, 2023, Farah verified that the following interrogatory response was true and accurate: That the only African American APPs employed by the University from 2018 to August of 2023 who identify as African American were Judy Haynes and Maryan Barqadle. OSU's Answers and Objections to Plaintiff's Second Set of Interrogatories, RE 29-2, Page ID # 1531-1535. However, at his deposition on August 29, Farah testified that there were at least two other African American APPs who worked at OSU during this time frame – Kim Tartt and Kineta Bayne. Farah Deposition I Transcript, RE 19, Page ID # 66-67. When counsel for Plaintiff pointed out the discrepancy, Farah revised his response to this question yet again. On October 10, Farah verified that the list of African American APPs employed by OSU from 2018 to August of 2023, were Judy Haynes,

Maryan Barqadle, Kineta Bayne, Kim Tartt, Gifty Menka and Melissa Jones.  Brief in Opposition, RE 29, Page ID # 1534.  Thus, within a period of about six weeks Farah answered the same question three different ways.

Another example of Farah's dubious veracity is his testimony that he has "about a 90 percent hire-rate of African Americans that have applied to being hired." Farah Deposition I Transcript, RE 19, Page ID # 319-320.  When asked how he calculated this percentage, Farah stated that he could not recall the exact number of APPs he has hired while he has been at OSU but estimates that it is roughly ten to twelve and that he has hired two African American APPs.  *Id.* at 263, 320.  Farah, however, also testified that he does not know the race of APP applicants unless the applicant happens to already be employed by OSU.  *Id.* at 322-332.  In other words, Farah's statement about a 90% hire rate was, at best, a guess.

Farah unequivocally testified on August 29 that Kineta Bayne, who is an African American APP at OSU, was on the hiring team for APP Ross Heart.  *Id.* at 309.  When subsequently presented with documents showing that Bayne was not on that hiring team, Farah changed this testimony as well.  Farah Deposition II Transcript, RE 20, Page ID # 520.

**D. Hiring process for APP Ross Heart**

In September of 2021, Solis applied for OSU's APP Ross Heart position. Solis Deposition Transcript, RE 27, Page ID # 1485. Farah was the hiring manager for APP Ross Heart. Farah Declaration, RE 25-1, Page ID # 1426.

The posting for APP Ross Heart described the job as:

> The APP is responsible for providing health care services to medical Cardiac patients. Enhances and expands the patient care within the medical practice. Collaborates with a physician(s) & other clinicians in providing a full scope of patient care. Focus is on prevented health or the management of acute or stable chronic conditions. Performs medical services within the confines of the Standards Care Arrangement, State of Ohio, OSUWMC Medical By Laws, and organizational policies.

Farah Declaration, RE 25-1, Page ID # 1429. The described Duties and Responsibilities for APP Ross Heart were listed as "Teamwork/Team Leadership, Customer Focus, Staff Development/Job Knowledge and Resource Management which should be interwoven throughout the employee's position description". *Id.*

The term Left Ventricular Assist Device or LVAD does not appear anywhere on the Job Posting for APP Ross Heart, nor does the job posting state that recent APP graduates are preferred to less recent APP graduates. *Id.* at 1428-1430.

Daniel Wade, who is white, was offered and accepted the APP Ross Heart position in December of 2021. Farah Deposition I Transcript, RE 19, Page ID # 270. Wade had no APP experience when he was offered the job, and had just received his

nurse practitioner degree five months before the interview, in May of 2021.  *Id.* at 272.  Wade had 4-1/2 years of experience as a staff nurse on 4 Ross.  *Id.*  In comparison, the Plaintiff had 9-1/2 years of nursing experience, working on 5 Ross, the Vascular and Cardiothoracic Surgery area during that entire 9-1/2 year period.  Solis Declaration, RE 27, Page ID # 1483-1485.  Neither Wade nor Solis was stationed on 6 Ross, the floor with the focus on patients needing LVADs.  Solis, however, had worked on 6 Ross on numerous occasions and, therefore, had peripheral LVAD experience.  *Id.* at 1484.

Initial interviews for APP Ross Heart were held on October 15, 2021.  Farah Deposition II Transcript, RE 20, Page ID # 498-99.  Farah compiled a spreadsheet for this interview process.  *Id.* at 498.  Other than this spreadsheet there are no other documents relating to the APP Ross Heart interview process, such as interview grids or notes.  LVAD experience is not mentioned anywhere on Farah's spreadsheet.  *Id.*

Solis was the only African American applicant for APP Ross Heart.[1]  *Id.* at 502-503.  OSU admitted that Solis was qualified for this position, and she interviewed for it in October of 2021.  Defendant's Answer, RE 11, Page ID # 43.

---

[1] Since disclosing race is not mandatory for University job applicants, the accuracy of this representation by Farah is questionable.  However, if an applicant is someone who already works at the University, *i.e.*, is an internal candidate, the hiring manager will often know the race of that applicant due to the fact that the hiring manager has already seen the candidate.  Farah Deposition I Transcript, RE 19, Page ID # 323.

During Solis's interview no one asked if she had any experience with LVADs.  Solis Declaration, RE 27, Page ID # 1485.  If Solis **had** been asked this question, she would have stated that she had a significant amount of experience caring for patients with LVADs, and that she had received general training related to LVADs during her experience as a Staff Nurse with the University.  *Id.*

There were nine members on the interview team for APP Ross Heart.  Farah Deposition II Transcript, RE 20, Page ID # 503.  No one on the team was African American.  *Id.*  Farah did not make sure that the members of the interview team completed the University's required Affirmative Action and Equal Employment Opportunity training prior to participating in the interviews.  *Id.* at 506.

Several members of the interview team for APP Ross Heart failed to provide any feedback on the APP candidates who were interviewed.  *Id.* at 500.  Many of the interviewers simply wrote down names of candidates that they liked, but provided no reason as to why they preferred a particular candidate.  *Id.* at 510-511.  Farah did not follow up with the interview team members to ask why they preferred certain candidates and accorded equal weight to the preferences of all the team members, even those who did not articulate a reason for their preference.  *Id.* at 511-513, 526.  Farah never asked the interview team members who did not vote or provide feedback on a particular candidate why they did not participate.  *Id.* at 514.

11

The spreadsheet about candidate votes for APP Ross Heart is extremely muddled. According to the spreadsheet, one of the candidates that was eventually hired – Katherine Mathes –received no votes at all. *Id.* at 548. Another – Sarah Thornburg – received only four votes total, one no and three yes. *Id.* Wade had a total of six votes on his candidacy - five (5) yes votes and one (1) no vote, and Solis received five votes - two (2) yes votes and three (3) no votes. *Id*. When asked, Farah had no explanation as to why all nine members of the interview team did not vote on each of the candidates, or why he did not follow up with them. *Id*. at 511-514.

The decision of which candidates to move forward, moreover, was made despite the fact that **not all of the interview team voted on the candidates**. *Id.* Notably, if all of the nine people on the interview team for APP Ross Heart had provided input, it is entirely possible that the votes on the APP candidates hired would have been different. One of several potential scenarios is that Wade could have received five yes votes and four no votes and the Plaintiff could have gotten six yes votes and three no votes. However, Farah never asked the interview team members who did not vote what candidates they preferred, making this determination problematic. *Id*. at 514.

### E. Suspicious timing of the purported legitimate business reasons of LVAD experience and recent graduation

Neither the position description nor the spreadsheet for APP Ross Heart mention LVAD experience anywhere. Farah Deposition II Transcript, RE 20-1,

PAGE ID # 548-549; Farah Declaration, RE 25-1, Page ID # 1428-1430. LVAD training is a 2-3 hour class, which does not even require a test when the class is completed. RE 19, Page ID # 277. All of the seven APPs currently employed at the University who have completed LVAD training, including Wade, completed the training **<u>AFTER</u>** they were hired into their APP position. *Id.* at 279-281. Wade did not complete his 2-3 hour until May 13, 2022 - **months** after he started working in the APP Ross Heart position. *Id.* at 275-276. Likewise, all of the APPs on the team on which Wade was placed took LVAD training after they were hired as an APP by the University. *Id.* at 276.

Significantly, Farah's supposed preference for recent APP grads conflicts with OSU policy. Sometime between August of 2022 and early 2023, OSU explicitly instructed Medical Center APPs that new graduate APPs could not be hired unless the hiring was first cleared with the APP Directors. McLaughlin Deposition Transcript, RE 23, Page ID # 831.

OSU's statements in its MSJ that nursing experience has no relevance to APP positions are contradicted by its own records. The interview spreadsheet prepared by Farah for APP Ross Heart, which was ultimately offered to Daniel Wade, contains the following comments:

> "has cardiology nursing experience"[2]
> "new NP but great 4 Ross RN exp"

---

[2] This comment appears numerous times on the spreadsheet.

"new NP without strong RN background"
"cardiology nursing experience"
"strong 2 Ross RN"
"Experienced 6 Ross RN"
"Has recent cardiology nursing experience"
"great cardiac nursing experience"
"extensive cardiac nursing experience"
"has several years of RN experience however no cardio"

RE 20-1, Page ID # 548-550.

**F. OSU's dismal hiring of African American APPs**

In the four-and-a-half-year period from January 31, 2019 to June 30, 2023, the number of APPs on the University's employee roster steadily increased, as shown in the chart below:

| DATE | TOTAL NUMBER OF APPs |
|------|----------------------|
| 01/31/2019 | 542 |
| 06/20/2019 | 542 |
| 09/30/2019 | 565 |
| 01/31/2020 | 572 |
| 06/20/2020 | 578 |
| 09/30/2020 | 588 |
| 01/31/2021 | 597 |
| 06/30/2021 | 584 |
| 09/30/2021 | 608 |
| 01/31/2022 | 624 |
| 06/30/2022 | 636 |
| 09/30/2022 | 662 |
| 01/31/2023 | 754 |
| 06/30/2023 | 771 |

McDougle Deposition Transcript, RE 22-1, Page ID # 758-759.  Despite this increase, during the four-year period between January 31, 2019 and December 4, 2022, OSU employed only two (2) African American APPs, Kineta Bayne and Kim Tartt.  Brief in Opposition, RE 29-1, Page ID # 1528.

When the number of African American APPs is compared to the total number of APPs employed by OSU between 2019 and 2023, the percentages of African American APPs employed by OSU has consistently been under **0.5%**, as shown on the various dates set forth below:

| DATE | NUMBER OF AFRICAN AMERICAN APPs/TOTAL NUMBER OF APPs | PERCENT OF AFRICAN AMERICAN APPs |
|---|---|---|
| 01/31/2019 | 2/542 | 0.369% |
| 06/20/2019 | 2/542 | 0.369% |
| 09/30/2019 | 2/565 | 0.354% |
| 01/31/2020 | 2/572 | 0.3496% |
| 06/20/2020 | 2/578 | 0.346% |
| 09/30/2020 | 2/588 | 0.34% |
| 01/31/2021 | 2/597 | 0.335% |
| 06/30/2021 | 2/584 | 0.342% |
| 09/30/2021 | 2/608 | 0.329% |
| 01/31/2022 | 2/624 | 0.32% |
| 06/30/2022 | 2/636 | 0.314% |
| 09/30/2022 | 2/662 | 0.302% |

Despite the fact that the total number of APPs at OSU increased by 120 between January 2019 and September 2022, not a single African American APP was hired in this nearly four-year (45 month) time period.  Brief in Opposition, RE 29,

Page ID # 1528-1529.  Notably, in the ten months following the filing of Solis's OCRC charge, OSU suddenly changed course and hired four African American APPs.  *Id.*

The percentage of African Americans who reside in Columbus, Ohio, where OSU is located, is 29%.  McDougle Deposition Transcript, RE 22, Page ID # 705.  The percentage of African Americans in the State of Ohio is 13%.  *Id.*  The percentage of African American Nurse Practitioners in the United States in 2022 was 9.9% and the percentage of African American Physician Assistants in 2022 was 4.5%.  Rosen Declaration, RE 26-2, Page ID # 1479.

### G. Expert opinion with respect to a statistically significant difference between the expected and actual number of African American APPs

A Chi-Square test compares different employment groups' expected numbers to their actual employment numbers.  *Id*.  A Chi- Square test also provides the probability of whether differences observed between the expected and actual numbers employed is due to random chance.  *Id.*  According to Solis's expert[3], when the expected number of employed African American APPS at OSU is compared with the actual numbers, African American APPs are underrepresented at 85 expected to be employed, compared to 2 actually employed.  *Id.*  White and other APPs are overrepresented at 577.  *Id.*  Solis's expert opined that there is a statistically

---

[3] Solis's expert, Dr. Harvey Rosen, has a Ph.D. in Economics.  Rosen Declaration, RE 26, Page ID # 1436.

significant difference between these expected and actual values and that this difference is so large that to almost a certainty OSU's observed pattern of APP hiring could not be due to random chance. *Id.*

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo, drawing all reasonable inferences in favor of Solis, the non-moving party. *Sandman v. New York Times Company*, 78 F.4th 319, 328 (6th Cir. 2023) (citation omitted).

In ruling on a motion for summary judgment, a judge's function is not to weigh the evidence, and determine the truth. *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' when ruling on a motion for summary judgment." *Helphenstine v. Lewis County, Kentucky*, 60 F.4th 305, 314 (6th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Evidence is to be viewed in the light most favorable to the nonmoving party, which means that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004)).

The ultimate question on a motion for summary judgment is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Martin v.*

*Saginaw County Road Comm'n*, 606 F.Supp.3d 639, 649 (E.D. Mich. 2022) (quoting *Anderson*, 477 U.S. 242 at 251-252).  As long as a reasonable jury could credit the nonmoving party's evidence, summary judgment is improper.  *George*, 966 F.3d at 462.

In the context of a request for summary judgment in an employment discrimination case, when a plaintiff **has made a prima facie case on an employment discrimination claim, courts must exercise caution in granting summary judgment because "'an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage.'"**  *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 810 (6th Cir. 2020) (quoting *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 55, 546 (6th Cir. 2004)) (emphasis added).  *See also Moffat v. Wal-Mart Stores, Inc.*, 624 Fed.Appx. 341, 348 (6th Cir. 2015).

Solis established a prima facie case, but the District Court failed to exercise the caution it was required to use and made improper factual and credibility determinations to find that Solis did not establish pretext.  This decision must be reversed.

## **ARGUMENT**

The District Court did not follow the Sixth Circuit's well-established tenets against credibility determinations, accepting as credible all of the testimony of

OSU's witnesses as to what OSU's true motivations for not hiring Solis were.  In order to find OSU's legitimate business reason was not pretextual, the District Court ignored a surfeit of contrary evidence that OSU's only witness was not believable. The District Court also applied an incorrect legal standard, ultimately erring when it found that Solis did not establish pretext.

To survive summary judgment, a plaintiff who has established a prima facie case of unlawful discrimination must provide sufficient evidence to permit a jury to conclude that an employer's stated reason for a discriminatory action is pretextual. *Browning v. Dep't of the Army*, 436 F.3d 692, 695 (6th Cir. 2006).  At the summary judgment stage, a plaintiff "need only rebut the employer's proffered rationales; she need not disprove them."  *Moffat*, 624 Fed.Appx. at 348 (citing *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012)).

Pretext can be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Levine v. DeJoy*, 64 F.4th 789, 798 (6th Cir. 2023) (quoting *White v. Baxter Healthcare Corp.*, 553 F.3d 381, 392 (6th Cir. 2008)).

Plaintiffs typically establish pretext in three ways, although these categories need not be followed rigidly:  1) by demonstrating that the employer's proffered reason was not based in fact, or 2) that it did not actually motivate the employer's

19

action or 3) that it was not sufficient to motivate the employer's action. *Stokes v. Detroit Pub. Sch.*, 897 Fed. Appx. 493, 500 (6th Cir. 2020), *reh'g denied* (Apr. 16, 2020). *See also Thompson v. Fresh Products, LLC*, 985 F.3d, 509, 522 (6th Cir. 2021) (quotation omitted). Instead, plaintiffs "'remain free to try to show pretext in whatever way they see fit.'" *Id.* The ultimate question before a court in determining pretext is whether a defendant declined to promote an employee for the stated reason or not. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

A plaintiff "must come forward with evidence that the defendant's reason for the employment action is false," but is not required to "present independent evidence" that the reason offered by the employer is pretext for discrimination. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 509 (6th Cir. 2021) (quoting *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (additional citation omitted)).

The District Court was presented with evidence that OSU's proffered reason for hiring Wade was not what actually motivated OSU, but ignored that evidence, holding that Solis did not establish pretext because Wade's LVAD experience and recent graduate status were objective. Opinion, RE 34, Page ID # 1591. The District Court also was presented with statistics and independent circumstantial evidence of pretext, but ultimately rejected this evidence. *Id.* at 1595. The District Court did so

because it found that Solis's statistics were not "sufficiently probative," and it did not see independent circumstantial evidence sufficient to establish pretext. *Id.*

**A. Despite conflicting evidence and several examples of Ajwad Farah's questionable veracity, the District Court accepted the entirety of Farah's testimony as credible, thereby holding that Solis did not show pretext.**

In order to survive summary judgment, a plaintiff must provide sufficient evidence to permit a jury to conclude that an employer's stated reason for a discriminatory action is pretextual. *Browning v. Dep't of the Army*, 436 F.3d 692, 695 (6th Cir. 2006); *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990)). A plaintiff, however, "need only rebut the employer's proffered rationales; she need not disprove them." *Moffat v. Wal-Mart Stores, Inc.*, 624 Fed.Appx. 341, 348 (6th Cir. 2015) (citing *Griffin v. Finkbeiner*, 689 F.3d 584, 493 (6th Cir. 2012)). In assessing pretext, a court must consider "'all the evidence that the plaintiff has put forth-evidence from the prima facie stage, evidence discrediting the defendant's proffered reason, and any additional evidence that the plaintiff chooses to put forth.'" *Willard*, 952 F.3d at 810 (quotation omitted).

While pretext is typically established by demonstrating that the employer's proffered reason was not based in fact, that it did not actually motivate the employer's action or that it was not sufficient to motivate the action, these categories need not be followed rigidly, as plaintiffs "'remain free to try to show pretext in whatever way they see fit.'" *Stokes v. Detroit Pub. Sch.*, 897 Fed.Appx. at 500. *See*

*also Thompson*, 985 F.3d at 522.  To establish the second prong of a pretext determination – that the employer's offered reason did not actually motivate the decision – a plaintiff can offer circumstantial evidence showing that it is more likely than not that the illegal motivation was the real reason.  *Braithwaite v. Dept. of Homeland Security*, 473 Fed.Appx. 405, 411 (6th Cir. 2012) (citation omitted).

The District Court made credibility determinations and drew improper inferences in favor of OSU in its Opinion and Order.  The District Court accepted as credible all of the evidence presented by OSU as to the legitimate business reason for why a white man was hired instead of Solis for APP Ross Heart.  The District Court also improperly ignored Solis's evidence that the purported legitimate reason was pretextual.

### 1.  LVAD experience.

The **sole** evidence presented by OSU on its motivation for hiring Daniel Wade for APP Ross Heart instead of Solis was Farah's testimony, and the only citations in the District Court's ruling as to OSU's legitimate business reason for hiring Wade and not Solis are to the two deposition transcripts of Farah.  Not a single other witness or document was presented by OSU to support Farah's assertion that he hired Wade due to his LVAD experience and the fact that Wade was a recent APP graduate.  If Farah was untruthful about these reasons, then OSU is out of luck as it has no other evidence for its purported legitimate business reason.

22

According to Farah, there were two reasons he offered the APP Ross Heart position to Wade.  The first was because Wade had more LVAD experience than Solis.  As a nurse on 4 Ross in post-cardiac surgery, Wade had experience caring for patients with LVAD heart pumps and this experience was "critical because [Wade] would be joining a team that managed the LVAD pumps."  Farah Deposition I Transcript, RE 19-1, Page ID # 351.

Wade's LVAD experience is a red herring.  It is something Farah came up with after Solis submitted her charges to the Ohio Civil Rights Commission and then filed this case.  This is clear when the job description and spreadsheet for APP Ross Heart are reviewed.  Neither document mentions LVAD experience anywhere.

Solis, moreover, was never asked about LVAD experience in her interview.  Solis also presented evidence that all of the seven APPs employed with OSU who have completed LVAD training did so AFTER they were hired into their APP positions.  Farah Deposition I Transcript, RE 19, Page ID # 289.  Likewise, all of the APPs on the team on which Wade was placed took LVAD training AFTER they were hired as an APP.  *Id.*  The District Court also ignored evidence presented by Solis that she too had experience caring for LVAD patients.  As the court was required to consider Solis's evidence discrediting OSU's proffered reason and failed to do so, it committed reversible error.

Further, for the District Court to conclude that Wade's LVAD experience was not pretextual, it was required to make a credibility determination that Farah's testimony was true. But other than statements by Farah, there is no evidence that Wade's LVAD experience was the reason he was offered APP Ross Heart.

### 2. Recent APP graduate.

The other reason Farah proffered for hiring Wade was that Wade was a more recent APP graduate than Solis. Like the LVAD reason, the **_only_** support for this reason are Farah's statements. Solis presented evidence to show that this reason also is pretextual, but the District Court failed to consider Solis's evidence in making its ruling.

First, OSU explicitly instructed its APPs that new graduate APPs could not be hired unless the hiring was first cleared with the APP Directors. McLaughlin Deposition Transcript, RE 23, Page ID # 831.

Second, Wade was the only new APP promoted to the next round of interviews for the APP Ross Heart position. There were five other new graduates on OSU's candidate list who were not promoted to the next round of interviews for APP Ross Heart – Alex Snavely, Nicole Onderko, Kendall Bader, Keith Haws, and Sarah-Jane Baserman. Farah Deposition II Transcript, RE 20-1, Page ID # 548. If new graduates were such a positive attribute for APP Ross Heart, then it made no sense that Wade was the **_only_** new graduate sent on to the second round for APP Ross

24

Heart.  OSU's own documents, therefore, show the fallacy of Farah's proffered reason for hiring Wade.

### 3.  Farah's credibility on the reason Wade was hired is questionable.

The District court appeared to completely disregard the section of Solis's Memorandum in Opposition to OSU's MSJ ("MIO") in which Solis questioned Farah's veracity by pointing out several significant facts on which Farah provided conflicting testimony.  Further, Farah did not hire any African American APPs in the three-and-a-half years between the time he started in his manager position in May of 2019 and December of 2022.  Farah Deposition I Transcript, RE 19, Page ID # 320-321, 325.  Suddenly, after learning of the Plaintiff's OCRC race discrimination charges, Farah hired two African American APPs.  *Id.* at 320-321.

### B. The District Court erred when it found that Solis's circumstantial evidence was "not enough" to raise a genuine issue of material fact.

The District Court erred when it held that Solis did not present enough circumstantial evidence to show pretext.  Opinion, RE 34, Page ID # 1582. Specifically, the Court conceded that Solis presented circumstantial evidence – minor deviations from policy and particular subjective elements in the hiring process – but, according to the Court, neither was enough to raise a genuine issue of material fact as to pretext.  *Id.* at 1596.

The Court also did not apply the correct analysis when it rejected Solis's argument about subjectivity in hiring, and failed to consider the evidence that white

APPs were hired after less than 10 attempts, while Solis has unsuccessfully applied for **89 APP jobs**. Further, Solis's expert report should not have been rejected as insignificant. Solis's statistical evidence was provided by a doctor of economics and OSU did not present any evidence rebutting the findings of Solis's expert.

## 1. The District Court erred in finding that the statistical evidence presented by Solis was insufficient.

### a. The cases relied on by the District Court are easily distinguishable.

The District Court declined to consider the expert report presented by Solis which found that the number of African American APPs employed at OSU is so low that OSU's pattern of hiring could not be due to random chance. Rosen Declaration, RE 26-2, Page ID # 1479. According to Solis's expert, there is a statistically significant difference between the expected and actual numbers of African American APPs employed at OSU. *Id.* The District Court relied on the Sixth Circuit cases of *Driggers v. City of Owensboro, Ky*, 110 Fed. App'x 499 (6th Cir. 2004) and *Hopkins v. Canton City Bd. Of Educ.*, 477 F. App'x 34, 358 (6th Cir. 2012) to hold that Solis's expert's report was not worthy of consideration because it failed to consider the relevant labor market. Opinion, RE 34, Page ID # 1594-1595.

The District Court neglected to consider a crucial distinction between the statistical evidence presented in this case and that presented in *Driggers* and *Hopkins*. In both of those cases the statistics were provided by the plaintiff, not by an expert report opining on the relevance of the statistics presented. Solis, however,

presented **expert evidence** on the statistical significance of on the numbers of African American APPs employed at OSU. As the statistical findings of a Ph.D. economist are easily distinguished from the simple numbers presented by counsel in *Driggers* and *Hopkins*, the District Court's reliance on those decisions was misplaced.

Solis's case is more akin to the Sixth Circuit's decision *Hopson v. DaimlerChrysler, Corp.*, 306 F.3d 427 (6th Cir. 2002). The plaintiff in *Hopson* presented an affidavit from a Ph.D. economist who performed a statistical analysis of data regarding the racial composition of the defendant employer's supervisors, managers, and guards in the defendant's security department. *Id.* at 431. Like Solis's expert, Dr. Rosen, the *Hopson* expert concluded that a disparity in the numbers of African American managers versus African American guards was statistically significant and indicated that African Americans were under-represented in supervisory and management positions. *Id.* at 437.

The *Hopson* court stated that when statistics find the difference in employment numbers to be statistically significant for a protected group, that finding eliminates the possibility that the discrepancy is due to chance. *Id.* (citing *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1468 (6th Cir. 1990)). Dr. Rosen – like the expert in Hopson and unlike the statistics presented in *Driggers* and *Hopkins* - demonstrated that the disparity was not due to random chance. *Id.*

27

### b. The relevant labor market is not the Greater Columbus area.

The District Court also declined to consider Solis's statistical evidence because it did not provide information about the number of African American APPs in the Greater Columbus area. Opinion, RE 34, Page ID # 1596. The District Court's skimpy analysis of this topic was simply that *Driggers* found that plaintiff's statistics failed because the numbers did not compare the gender composition of the police force to the qualified population in the labor market. *Id.* at 1594. Notably, the *Driggers* decision **never** defines the term relevant labor market. *Driggers*, 110 Fed. Appx. at 509. Rather, *Driggers* merely held that evidence that women make up 4.5% of the defendant's police force but are approximately half of the U.S. labor force was not probative. *Id.*

*Hopkins* was relied on by the District Court for the proposition that the relevant labor market was the racial composition of qualified school administration candidates in Canton, Ohio. As the *Hopkins*' plaintiff's statistics related to the racial composition of principals, teachers and students in the Canton schools, the *Hopkins* analysis is not even relevant to this case. *Hopkins*, 477 Fed. App'x. at 358. If Solis was trying to argue using the percentage of African American patients at OSU, then *Hopkins* might be applicable. Solis, however, never asserted this position. Moreover, the *Hopkins'* court never analyzes what the relevant labor market in that case is, but simply states that the plaintiff presented no evidence of the racial

28

composition of the pool of qualified candidates in the Canton teaching market.  *Id.* at 358.

The APP profession differs significantly from that of police officer and public school administrator.  As such, the relevant labor market cannot be assumed to be the same for all three.  Solis's expert used the U.S. as the relevant labor market and OSU presented no **evidence** to show that this was not accurate.  Like the District Court, OSU cited to *Driggers* and *Hopkins* to support its argument that the relevant labor market is the Greater Columbus area.  But *Driggers* and *Hopkins* are distinguishable not only because they involve completely different jobs, neither plaintiff provided an expert opinion supporting the statistics.

What constitutes the relevant labor market is a question of fact.  *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 423 (7th Cir. 2000) (citing *Hazelwood School Dist. v. United States*, 433 U.S. 299, 310-312, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)); *Scoggins v. Board of Ed. of Nashville, Arkansas Public Schools*, 853 F.2d 1472, 1479 (8th Cir. 1988).  As OSU presented no evidence to counter that of Solis's expert on the question of the relevant labor market, the lower court's decision to ignore the findings of Solis's expert was error.

### c. The District Court ignored evidence from Solis that the number of African American APPs at OSU is, and has been, less than 0.5%.

The other reason the District Court found Solis's statistics to be unreliable was because the race of employees at OSU is disclosed on a voluntary basis and,

29

accordingly, the statistics offered by Solis "may not" hold true to reality. Opinion, RE 34, Page ID # 1594.

This finding blatantly violates what a court is required to do in ruling on a request for summary judgment – to view evidence in the light most favorable to the non-moving party and to "accept direct evidence offered by the [non-movant] in response to a summary judgment motion … as true." *Muhammad*, 379 F.3d at 416. In this case, Solis presented evidence that could be true, but the District Court declined to accept it as true. Instead, the District Court improperly made a factual inference in favor of the movant, OSU. As this is not the proper standard under Rule 56, the District Court's failure to make this inference in Solis's favor is reversible error.

### 2. The District Court ignored evidence that white APP candidates were hired much more quickly than African American APP candidates.

Notably, the District Court failed to consider other circumstantial evidence, *i.e.*, that Solis applied for **89** APP positions at OSU without receiving a single job offer. Opinion, RE 34, Page ID # 1569. White counterparts of Solis were hired for the fifth and sixth APP positions to which they applied at OSU. McDougle Deposition, RE 22, Page ID # 760. This is circumstantial evidence of unlawful race discrimination by OSU and the lower court's failure to consider it is reversible error.

### 3. The burden imposed by the District Court with respect to OSU's use of subjective criteria was too rigorous and not based on current law in this Circuit.

The ultimate issue in an employment discrimination case is whether the use of subjective criteria was used to hide a discriminatory action. *Ramirez v. Hoffman*, 619 F.2d 442, 446 (6th Cir. 1980). This is because subjective evaluations by an employer have a "greater susceptibility for being a smokescreen for pretext." *George*, 966 F.3d at 467 (citing *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015) (additional citation omitted). "The legitimacy for the articulated reason for an employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority…." *Reynolds v. Chipotle Mexican Grill, Inc.*, 120 F.Supp.3d 704, 717-718 (S.D. Ohio 2015) (quoting *Grano v. Dep't of Dev.*, 699 F.2d 836, 836 (6th Cir. 1983)).

The District Court did not apply the correct standard to its pretext analysis. The District Court found that Solis did not make clear how the use of subjective criteria was used to disguise OSU's discriminatory action, citing to a 1983 Sixth Circuit decision as the basis for this legal standard. *Grano*, 699 F.2d at 837. According to the District Court, Solis's evidence of OSU's subjective evaluation process was not evidence of pretext because Solis failed to make clear how this subjective criterion was used to disguise OSU's discriminatory action. Opinion, RE

34, Page ID # 1591. Solis, however, in responding to OSU's Motion for Summary Judgment, is only required to cast doubt on OSU's asserted nondiscriminatory basis. *George*, 966 F.3d at 465 (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097 (2000)).

It is true that the ultimate issue in the case is whether subjective criteria was used to disguise discriminatory intent, but all Solis is required to do on summary judgment is provide "'enough evidence to convince a reasonable jury that OSU's reasons for not promoting her "'may have been a mere pretext.'" *Levine v. DeJoy*, 64 F.4th 789, 802 (6th Cir. 2023) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)). By requiring Solis to "make clear" how the subjective criteria was used to disguise OSU's discrimination, the District Court employed an improper legal standard. Moreover, because there were not African Americans involved in the hiring of the APP Ross Heart position, OSU's purported reason for hiring Wade is subject to particularly close scrutiny and the District Court did not subject OSU's reasons to such scrutiny. *See Reynolds*, 120 F.Supp.3d at 717-718.

Since the ultimate issue in dispute in an employment discrimination case is whether an interviewer's reason for his decision should be believed, it is improper for a court to assume that the interviewer's subjective perception of the job candidate is accurate. *Levine*, 64 F.4th at 800 (citation omitted). Therefore, on summary

judgment plaintiffs in employment discrimination cases do not have to make clear how subjective criteria was used to disguise discrimination.

*Aday* also is incorrectly cited by the District Court on this topic. The *Aday* court does state that a non-discriminatory legitimate business reason will not be questioned even if the employer's hiring process was entirely subjective. RE 34, Page ID # 1591. *Aday v. Westfield Ins. Co.*, No. 21-3115, 2022 WL 203347, at *5 (6th Cir. Jan. 24, 2022). *Aday*, however, does not hold that evidence of subjectivity in the decision-making process cannot also be used as a factor by an employee to show pretext. *Id.* In fact, if *Aday* had held that evidence of subjectivity cannot be used, its holding would have been in conflict with myriad Sixth Circuit rulings which have explicitly held to the contrary: *Levine v. DeJoy*, 64 F.4th 789, 800 (6th Cir. 2023); *Tillotson v. Manitowoc Co., Inc.*, 727 Fed.Appx. 164, 169 (6th Cir. 2018); *Scott v. Eastman Chemical Co.*, 275 Fed.Appx. 466, 476 (6th Cir. 2008) (quoting *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996)); *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 44, 461 (6th Cir. 2004).

Moreover, the criteria Farah used to describe Solis – "timid" and "may not have been right environment for her" versus that he used for Wade "strong communication skills," "professional" and "friendly" could easily be masking discriminatory intent. Farah Deposition II Transcript, RE 20-1, Page ID # 548. Farah's comments also are in direct conflict with those of another member of the

interview team, Amber Grose, who found Solis to be "very engaged." *Id.*  How are engagement, timidity and friendliness measured?    These are subjective determinations, as highlighted by the fact that two members of the exact same interview panel found the candidate to be both timid and very engaged.

## CONCLUSION

The ruling being appealed is a grant of summary judgment to the movant in an employment discrimination case in which the employee established a prima facie case.  The issue on appeal is whether the employee provided sufficient evidence to permit a jury to conclude that its stated reason for not promoting her is pretextual.  As an employer's true motivation for a hiring decision is "particularly difficult to ascertain," such a determination is "unsuitable for disposition" on summary judgment and a trial court must "exercise caution" in doing so.  *See Willard*, 952 F.3d at 810.

The lower court ignored this admonition.  Despite being presented with evidence that OSU's LVAD and recent graduate reasons for hiring Wade only came up after Solis filed her OCRC charge, the lower court declined to view this evidence in a light favorable to Solis.  The lower court also rejected Solis's expert statistical findings despite having no contrary evidence from OSU.  The District Court also ignored other circumstantial evidence of discrimination.

As the lower court failed to properly apply the standard required by Civ.R. 56 in ruling on OSU's MSJ, its decision granting OSU's Motion should be reversed.

<div style="margin-left: 40%;">

Respectfully submitted,
COHEN ROSENTHAL & KRAMER LLP

/s/ Ellen M. Kramer
Ellen M. Kramer (0055552)
*emk@crklaw.com*
Jason R. Bristol (0072989)
*jbristol@crklaw.com*
COHEN ROSENTHAL & KRAMER LLP
3208 Clinton Avenue
Cleveland, Ohio 44113
(216) 815-9500 [Telephone]
(216) 781-8061 [Facsimile]

*Counsel for Plaintiff Stephanie Solis*

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel for Appellant certifies that the foregoing **Brief of Appellant Stephanie Solis** complies with the type-volume of Fed.R.App.P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed.R.App.P. 32(f), according to the word count functions of Microsoft Word 365, the word-processing system used to prepare this brief, there are 7,683 words, including footnotes, in this Brief.

The undersigned counsel for Appellant also certifies that the foregoing Brief of Appellant Stephanie Solis complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman in 14-point.


/s/ Ellen M. Kramer                              05/23/2024
Ellen M. Kramer (0055552)                  Date
Attorney for Appellant

## <u>**CERTIFICATE OF SERVICE**</u>

I certify that on this 23rd day of May 2024, a copy of the foregoing **Brief of Appellant Stephanie Solis** was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

<div align="right">

/s/ Ellen M. Kramer
Ellen M. Kramer (0055552)

</div>

**ADDENDUM**

| Record Entry Number | Record Item Description | Date Filed | Page ID Range |
|---|---|---|---|
| 11 | Answer of Defendant to Plaintiff's Complaint | 6/9/23 | 41-50 |
| 19 | Ajwad Farah Deposition Transcript Vol. I | 11/22/23 | 255-490 |
| 20 | Ajwad Farah Deposition Transcript Vol. II | 11/22/23 | 491-550 |
| 21 | Sheila Mapes Deposition Transcript | 11/22/23 | 551-673 |
| 22 | Dr. Leon McDougle Deposition Transcript | 11/22/23 | 674-786 |
| 23 | Brea McLaughlin Deposition Transcript | 11/22/23 | 787-979 |
| 24 | Defendant's Notice of Filing Deposition of Stephanie Solis and Deposition Transcript of Solis | 12/14/23 | 980-1233 |
| 25-1 | Declaration of Ajwad Farah | 12/15/23 | 1425-1435 |
| 26 | Declaration of Dr. Harvey Rosen | 12/15/23 | 1436-1482 |
| 27 | Declaration of Stephanie Solis | 01/05/24 | 1483-1486 |
| 29-1 | Exhibit 1 to Plaintiff's Memorandum in Opposition to Motion for Summary Judgment | 01/05/24 | 1527-1529 |
| 29-2 | Exhibit 2 to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment | 01/05/24 | 1531-1535 |
| 29-3 | Exhibit 3 to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment | 01/05/24 | 1536-1541 |

| 34 | Opinion and Order | 03/07/24 | 1568-1596 |
|---|---|---|---|
| 35 | Judgment in a Civil Action | 03/07/24 | 1597 |
| 36 | Plaintiff's Notice of Appeal | 03/18/24 | 1598-1599 |