**No. 24-3230**
## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STEPHANIE SOLIS, | : | On Appeal from the |
| Plaintiff-Appellant, | : | United States District Court |
| v. | : | Southern District of Ohio |
| THE OHIO STATE UNIVERSITY | : | |
| WEXNER MEDICAL CENTER, | : | District Court Case No. |
| Defendant-Appellee. | : | 2:23-cv-01390 |
| | : | |
| | : | |
| | : | |

---

## BRIEF OF APPELLEE

---

DAVE YOST
Ohio Attorney General

T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record
KATIE ROSE TALLEY
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Thomas.Gaiser@OhioAGO.gov

*Counsel for Appellee*
  *Ohio State University*
  *Wexner Medical Center*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................iii

STATEMENT REGARDING ORAL ARGUMENT ...........................vi

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES .........................................................2

INTRODUCTION ............................................................................3

STATEMENT OF THE CASE .............................................................5

    I.    OSU employs medical professionals with advanced training known as Advanced Practice Providers. ...............................................5

    II.    Solis worked at OSU as a staff nurse with no Advanced Practice Provider experience. ..................................................................6

    III.    Solis applied for Advanced Practice Provider positions and ultimately was not selected. ...........................................................8

    IV.    Solis brought a Title VII claim based on her failure to obtain an Advanced Practice Provider position, and the district court granted summary judgment for OSU. ...................................................15

STANDARD OF REVIEW ...............................................................18

SUMMARY OF THE ARGUMENT ...................................................19

ARGUMENT...................................................................................20

    I.    There is no dispute of material fact over whether OSU had legitimate, non-discriminatory reasons for selecting another candidate over Solis. ..20

        A.    It is undisputed that OSU's proffered bases for its hiring decision are legitimate criteria for Advanced Practice Provider positions........21

B.      Farah was consistent in his explanation of OSU's reasons for selecting another candidate over Solis and had no material discrepancy in his testimony. ...........................................24

C.      Solis's speculation cannot create a factual dispute as to the legitimacy of the non-discriminatory reasons for OSU's hiring decision.................................................................................28

II.     Plaintiff's statistical analysis is legally insufficient to establish pretext. .. 31

A.      Plaintiff's statistical analysis uses inapplicable comparator data from the general African American populace and nationwide employment statistics. ......................................................31

B.      Plaintiff's statistical analysis depends on voluntary, self-reported data, which Plaintiff admits may be inaccurate. ...............................35

C.      The proponent of statistical evidence bears the burden of establishing the "relevant labor market," and Plaintiff has not met that burden. ........................................................................36

III.    Plaintiff's additional circumstantial evidence of discrimination is legally insufficient to establish pretext.....................................................38

CONCLUSION...................................................................................41

CERTIFICATE OF COMPLIANCE....................................................42

CERTIFICATE OF SERVICE ............................................................43

DESIGNATION OF DISTRICT COURT RECORD..........................44

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alexander v. Local 496, Laborers' Int'l Union,*
    177 F.3d 394 (6th Cir. 1999) ............................................................... 33

*Allen v. Wal-Mart Stores, Inc.,*
    602 F. App'x 617 (6th Cir. 2015) ..................................................... 19

*Amyette v. Providence Health Sys.,*
    388 F. App'x 606 (9th Cir. 2010) ................................................ 37-38

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ......................................................................... 18

*Barnes-Staples v. Carnahan,*
    88 F.4th 712 (7th Cir. 2023) ...................................................... 33, 34

*Blair v. Henry Filters, Inc.,*
    505 F.3d 517 (6th Cir. 2007) ...................................................... 36, 37

*Boutros v. Canton Reg'l Transit Auth.,*
    997 F.2d 198 (6th Cir. 1993) ............................................................ 18

*Browning v. Dep't of the Army,*
    436 F.3d 692 (6th Cir. 2006) ............................................................ 29

*Cox v. Ky. DOT,*
    53 F.3d 146 (6th Cir. 1995) .................................................. 21, 24, 26

*Dean v. City of Shreveport,*
    438 F.3d 448 (5th Cir. 2006) ........................................................... 32

*Driggers v. City of Owensboro,*
    110 F. App'x 499 (6th Cir. 2004) .............................................. 32-33

*Dugan v. Smerwick Sewerage Co.,*
    142 F.3d 398 (7th Cir. 1998) ........................................................... 28

*EEOC v. Olson's Dairy Queens,*
    989 F.2d 165 (5th Cir. 1993) ........................................................... 35

*Fogerty v. MGM Grp. Holdings Corp.*,
  379 F.3d 348 (6th Cir. 2004) ............................................................ 28

*Gambill v. Duke Energy Corp.*,
  456 F. App'x 578 (6th Cir. 2012) ................................................ 35, 39

*Gault v. Zellerbach*,
  1998 WL 898831 (6th Cir. Dec. 16, 1998) ...................................... 39

*Glennborough Homeowners Ass'n v. U.S. Postal Serv.*,
  21 F.4th 410 (6th Cir. 2021) ............................................................ 28

*Grano v. Dep't of Dev.*,
  637 F.2d 1073 (6th Cir. 1980) .......................................................... 33

*Grano v. Dep't of Dev.*,
  699 F.2d 836 (6th Cir. 1983) ............................................................ 40

*Grant v. Metro. Gov't of Nashville & Davidson Cnty.* ,
  446 F. App'x 737 (6th Cir. 2011) ........................................... 33-34, 34

*Hazelwood Sch. Dist. v. United States*,
  433 U.S. 299 (1977) .......................................................................... 32

*Hopson v. Daimlerchrysler Corp.*,
  306 F.3d 427 (6th Cir. 2002) ...................................................... 35, 39

*K.V.G. Props., Inc. v. Westfield Ins. Co.*,
  900 F.3d 818 (6th Cir. 2018) ............................................................ 29

*Kinnard v. Rutherford Cnty. Bd. of Educ.*,
  109 F. App'x 85 (6th Cir. 2004) ....................................................... 32

*Lindsay v. Yates*,
  578 F.3d 407 (6th Cir. 2009) ............................................................ 19

*Long v. Saginaw*,
  911 F.2d 1192 (6th Cir. 1990) .......................................................... 37

*Love v. TVA Bd. of Dirs.*,
  2008 WL 906115 (M.D. Tenn. Mar. 31, 2008) ................................. 40

*McDaniels v. Plymouth-Canton Cmty. Sch.*,
  755 F. App'x 461 (6th Cir. 2018) ..................................................... 29

*Midland Asphalt Corp. v. United States*,
    489 U.S. 794 (1989) ................................................................ 1

*N.Y. City Transit Auth. v. Beazer*,
    440 U.S. 568 (1979) ........................................................... 34-35

*Peeples v. City of Det.*,
    891 F.3d 622 (6th Cir. 2018) .............................................. 39

*Phillips v. Cohen*,
    400 F.3d 388 (6th Cir. 2005) .............................................. 34

*Regner v. Chicago*,
    789 F.2d 534 (7th Cir. 1986) .............................................. 38

*Sandmann v. N.Y. Times Co.*,
    78 F.4th 319 (6th Cir. 2023) .............................................. 18

*Scott v. Harris*,
    550 U.S. 372 (2007) ........................................................... 18

*Simpson v. Midland-Ross Corp.*,
    823 F.d 937 (6th Cir. 1987) .............................................. 39

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) ........................................................... 19

*United States v. Loines*,
    56 F.4th 1099 (6th Cir. 2023) ........................................... 41

## Other

28 U.S.C. § 1291 .................................................................... 1

Fed. R. App. P. 4 .................................................................... 1

Fed. R. Civ. P. 56 .................................................................. 18

## STATEMENT REGARDING ORAL ARGUMENT

While Appellee Ohio State University Wexner Medical Center remains ready to participate in oral argument should the Court deem it beneficial, OSU respectfully states that it does not believe oral argument is necessary in this case. OSU believes that the briefing sufficiently presents the appropriate issues to the Court for evaluation and that this appeal does not implicate either particularly complex facts or issues that would warrant expenditure of judicial resources on oral argument.

## JURISDICTIONAL STATEMENT

The district court issued its decision and judgment granting summary judgment to OSU on March 7, 2024.  Op., R. 34; Judgment, R. 35.  That order is a final judgment disposing of all claims in the case.  *See Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989).  Appellant timely filed this appeal on March 18, 2024.  Notice of Appeal, R. 36; *see* Fed. R. App. P. 4(a)(1)(A).  This Court has jurisdiction to hear this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether OSU proffered non-discriminatory bases for its hiring decision where it is undisputed that those reasons are legitimate criteria and the Plaintiff did not otherwise raise a material factual question, as the district court held.

2.  Whether statistical evidence is legally insufficient to establish pretext in an employment discrimination case when the Plaintiff fails to identify the relevant labor market and uses inapplicable comparators, as the district court held.

3.  Whether the Plaintiff failed to provide separate circumstantial evidence sufficient to establish pretext, as the district court held.

## INTRODUCTION

Applying the ordinary rules of summary judgment to the record resolves this case. Plaintiff Stephanie Solis alleged a Title VII racial discrimination claim against her employer, Ohio State University Wexner Medical Center, based on her failure to obtain two highly competitive positions. Solis works as a *staff nurse* at OSU's Ross Heart Hospital but applied for two Advanced Practice Provider positions for *nurse practitioners* or physician assistants. Solis had zero Advanced Practice Provider experience, and she had not obtained Acute Care certification. OSU went with other applicants to fill the Advanced Practice Provider positions.

Then, Solis filed this litigation claiming she was passed over due to her race. The district court granted summary judgment on that claim in favor of OSU. While Plaintiff met the relatively low hurdle to establish a prima facie case, the district court held that OSU rebutted that case with legitimate and non-discriminatory bases for its hiring decisions. One of the candidates OSU selected had years of experience working with the same high-risk cardiac patients and specific cardiac device as the hiring team. The other successful candidate had over two years of experience working as an Advanced Practice Provider. Solis did not offer the same experience as either selected candidate.

The district court determined that Plaintiff failed to raise a material factual question as to whether OSU's legitimate reasons were pretextual. Solis offered only circumstantial evidence of discrimination, including statistical analysis purporting to show that the number of African American Advanced Practice Providers employed by OSU was lower than expected by a statistically significant degree. The district court rejected that analysis as non-probative because it used both flawed baseline and comparator data. The district court further held the remaining circumstantial evidence legally insufficient to show pretext.

On appeal, Plaintiff challenges the district court's holdings as to both OSU's non-discriminatory reasons for its hiring decisions and Plaintiff's failure to show pretext. Solis never disputes that OSU's non-discriminatory reasons for its hiring decisions are legitimate hiring criteria for this profession. Instead, Solis attempts to manufacture a credibility issue via non-existent or non-material discrepancies in the testimony of OSU's witness, an Advanced Practice Provider hiring manager named Ajwad Farah. But the purported inconsistencies have no bearing on Farah's testimony on the key issue—OSU's reasons for selecting another candidate over Solis. This Court has held that minor inconsistencies that do not affect otherwise uncontroverted evidence on material issues do not create a credibility issue.

Solis's attempts to revive her pretext arguments, via inferential leaps from statistical evidence, fare no better.  Well-established law requires that statistical evidence of discrimination must rely on data from the "relevant labor market."  Solis's analysis fails because the three comparators her expert analyzes—the African American percentage of the *general population* in Ohio, the African American percentage of the *general population* in Columbus, and the percentage of African American Advanced Practice Providers *nationwide*—are vastly overbroad and do not constitute OSU's labor pool for African American Advanced Practice Providers.  This Court should affirm the judgment of the district court.

## STATEMENT OF THE CASE

**I.    OSU employs medical professionals with advanced training known as Advanced Practice Providers.**

This appeal involves an employment discrimination claim alleging race-based failure to promote.  The claim arises from the Ohio State University Wexner Medical Center's hiring decisions for Advanced Practice Provider positions (sometimes referenced in the record as "APPs") in its Ross Heart Hospital.  Understanding the structure of Ross Heart Hospital is key to this dispute.

Ross Heart Hospital employs nurses, nurse practitioners, and physician assistants.  Both nurse practitioners and physician assistants require specific schooling and certifications.  At OSU, employees who work as nurse practitioners and

physician assistants are classified as Advanced Practice Providers (APPs). McLaughlin Aff., R. 23-1, PageID#891. There is thus a distinction between *nurses* on one hand, and *nurse practitioners* or physician assistants on the other. Ajwad Farah, one of the Advanced Practice Provider hiring managers for Ross Heart Hospital, testified that a "nurse and an APP are two different roles" and "are different professions." Farah trans. I, R. 19, PageID#273; Farah trans. II, R. 20, PageID#524. There are various nurse practitioner certifications specializing in particular treatment areas, such as family medicine or acute care. *See* Solis trans., R. 24, PageID#1173.

## II. Solis worked at OSU as a staff nurse with no Advanced Practice Provider experience.

Plaintiff Stephanie Solis began working for OSU in 2011 as a part-time nurse in Ross Heart Hospital's internal resource pool, which is an interim position that fills scheduling gaps and vacancies from full-time staff. Solis trans., R. 24, PageID#999. At that time, Solis held an associate's degree in nursing. *Id.* PageID#993. In 2012, Solis obtained a bachelor's degree in nursing and started working as a full-time staff nurse at OSU. *Id.* PageID#993–94, 1002–03. Since then, Solis has "always" worked as a staff nurse assigned to the fifth floor of Ross Heart Hospital, where she treats patients "transitioning out of intensive care" in a vascular and thoracic "'stepdown' unit." *Id.* PageID#1015; Farah Decl., R. 25-1, PageID#1425. Solis occasionally has

6

"float[ed]" on other hospital floors, including those with cardiac surgery and heart failure patients. Solis trans., R. 24, PageID#1123–24, 1172.

In 2016, Solis obtained her master's in nursing. *Id.* PageID#994. She became certified as a Family Nurse Practitioner two years later in 2018. *Id.* PageID# 1006–07. In 2019, Solis began applying to Advanced Practice Provider positions at OSU. She was specifically interested in vascular surgery or cardiac surgery nurse practitioner positions. *Id.* PageID#1064. In either late 2019 or early 2020, Ajwad Farah— who again was one of the hiring managers for Advanced Practice Providers at Ross Heart Hospital—counseled Solis that she would be "well advised" to gain "significant experience" in acute care and obtain an Acute Care Nurse Practitioner certification if she wanted to be more competitive for Acute Care Nurse Practitioner positions. Farah Aff., R. 19-1, PageID#349. An Acute Care Nurse Practitioner certification involves a year-long program with different clinical rotations. Solis trans., R. 24, PageID#1066–67.

Solis appeared to recognize the significance of obtaining Acute Care certification. In her 2018 Personalized Performance Plan, Solis indicated that one of her professional-development goals was "exploring the possibility of returning to school for a post graduate certification as Acute Care Nurse Practitioner in order to obtain an inpatient position." Solis trans. Ex. Z, R. 24-26, PageID#1329. She also raised acute

care certification with both Advanced Practice Provider managers at Ross Heart Hospital when she was applying for Advanced Practice Provider positions.  In 2021, Solis emailed Farah regarding her application for an Advanced Practice Provider position, informing him that she "plans to obtain an Acute Care Post Masters Certificate in the near future."  Farah trans. Ex. 2, R. 19-1, PageID#352.  She emailed Brea McLaughlin, the other Advanced Practice Provider manager, to determine whether Advanced Practice Provider vascular surgery positions were open to Family Nurse Practitioners like Solis.  McLaughlin told Solis that Family Nurse Practitioners had been allowed to hold these positions "if they agree to going back for their acute care NP."  McLaughlin trans. Ex. 16, R. 23-1, PageID# 970.  It is undisputed that Solis never obtained an Acute Care Nurse Practitioner certification, despite testifying that "it would be fairly easy for me to do it."  Solis trans., R. 24, PageID#1066–67.

### III.  Solis applied for Advanced Practice Provider positions and ultimately was not selected.

Between 2019 and 2022, Solis applied for several Advanced Practice Provider positions at OSU, but only two are the subject of this litigation:  a position as a Cardiology Advanced Practice Provider (Requisition no. R26560) and a position as a Vascular Surgery Advanced Practice Provider (Requisition no. R42367).  Both positions were highly competitive, with one garnering over forty applicants.  Solis was not selected for either position.  It is undisputed that Solis had no Advanced Practice

Provider experience at the time that she applied for Advanced Practice Provider positions because she had never worked as a nurse practitioner or physician assistant. *See* Solis trans., R. 24, PageID#1059.

**Cardiology Advanced Practice Provider**

The Cardiology Advanced Practice Provider opening (R26560) was for two Advanced Practice Provider positions at the Ross Heart Hospital.  There were 44 total applicants, including Solis.  Solis trans. Ex. CC, R. 24-29, PageID# 1344–45.  Solis was the only African American applicant.  Farah trans. II, R. 20, PageID#502–03.  Farah was the hiring manager for this position.  Farah trans. I, R. 19, PageID#262–63; Solis trans., R. 24, PageID#1047, 1058.  Selection was a multi-step process.  After reviewing resumes, 25 candidates were selected for interviews, including Solis.  Farah trans. I, R. 19, PageID#283.  Interviews were conducted by a nine-person board comprised of staff from Farah's unit who volunteered to serve on the board.  *Id.*; Farah trans. II, R .20, PageID#503–04.  A subset of candidates advanced to additional interviews based on the number of votes they obtained; Solis was one of eight candidates who did not advance because she received only two "yes" votes.  Farah trans. II, R. 20, PageID#514.

OSU ultimately hired two other applicants:  David Wade, who self-identifies as Caucasian, and Katherine Mathis, who self-identifies as Asian.  *See* Farah Aff., R.

9

19-1, PageID#351; Solis trans. Ex. CC, R. 24-29, PageID# 1344.  Mathis had Advanced Practice Provider experience in the ER, "which provided her with daily interactions with the very Cardiology Consult Team that had the opening."  Farah Aff., R. 19-1, PageID#351.  Solis does not challenge the selection of Mathis and focuses instead on Wade.

Wade was a staff nurse for over four years on the fourth floor of Ross Heart Hospital.  On that floor, Wade worked with the same type of patients and specific cardiac device (left ventricular assistant device pump) as the team that was hiring for this position.  *See* Farah trans. I, R. 19, PageID#270–72, 280.  Farah testified that he chose Wade over Solis for two reasons:  Wade's experience with left ventricular assist devices (sometimes referenced in the record as "LVADs"), and the recency of his nurse practitioner clinical rotations.  *Id.* PageID#273–75.

***First***, Wade's position on the fourth floor of Ross Heart Hospital gave him experience with cardiac ICU-level patients, post-transplant patients, and post-cardiac surgical patients—"all patients that we deal with on the team that he was hired for."  Farah trans. II, R. 20, PageID#525.  Those experiences also gave Wade specific experience with left ventricular assist devices.  *Id.*  Wade worked with "unstable LVAD patients," which meant "Wade was identifying issues with the LVAD device itself and all the corresponding problems associated with patients in a critically ill,

10

life-sustaining situation." Farah Decl., R 25-1, PageID#1426. Farah explained that "[t]his experience was critical because he would be joining a team that managed the LVAD pumps." Farah Aff., R. 19-1, PageID#351.

Solis, in contrast, "did not have the same" type of left ventricular assist device experience as Wade. Farah Decl., R. 25-1, PageID#1426. Farah explained that "Solis treated stable LVAD patients," which "means that she did nothing to treat LVAD issues." *Id.* Solis admitted as much: she had experience with "stable" left ventricular assist devices in patients who have had the devices "for a long time." Solis trans., R. 24, PageID#1171–72. Stable left ventricular assist device patients, she explained, have had their devices "for a while and they're there for maybe another issue, but not their [devices], so there's no issue with their [devices]." *Id.* PageID#1172. Solis had "floated" on the fourth and sixth floors of Ross Heart Hospital, but unlike Wade Solis did not work primarily on the fourth floor. "[P]atients that are getting brand-new [devices]" are on the fourth floor, so Solis routinely "wouldn't be right there with them." *Id.*

***Second***, Wade had recently concluded his nurse practitioner clinical rotations. Farah explained that an applicant fresh off their nurse practitioner clinical rotations "currently ha[s] that process in [the applicant's] muscle memory and [] functionality throughout the day"—as opposed to someone who was years out of their nurse

practitioner clinical rotations and had never practiced as a nurse practitioner. Farah trans. I, R. 19, PageID#274. While neither Wade nor Solis had Advanced Practice Provider work experience, Wade was "fresh" from his clinical rotations, while Solis was years out from her clinical experience and "rusty." *Id.*

Farah applied this preference across other Advanced Practice Provider positions. He hired multiple recent nurse practitioner graduates for those positions besides Wade. *Id.* PageID#288, 312–13. McLaughlin similarly testified that new graduate nurse practitioners may be appropriate candidates even for the cardiac surgery positions she managed, "[i]f they have critical care experience with cardio vascular surgery patients." McLaughlin trans., R. 23, PageID#853.

**Vascular Surgery Advanced Practice Provider**

OSU received 14 applications for the Vascular Surgery Advanced Practice Provider position (R46367). *See* Solis trans. Ex. KK, R. 24-37, PageID#1379. Brea McLaughlin, the Advanced Practice Provider Manager for Cardiovascular Surgery at OSU, was the hiring manager for this opening. McLaughlin trans., R 23, PageID#793–94, 798; McLaughlin Aff., R. 23-1, PageID#891. This position had preferred qualifications: Advanced Practice Provider experience working as a nurse practitioner or physician assistant, and certification as an Acute Care Nurse Practitioner. McLaughlin Aff., R. 23-1, PageID#891. McLaughlin testified that

"experience as a PA or NP is the main comparable factor when evaluating NPs/PAs candidates during the interview process." *Id.* Solis was not interviewed for this role because she lacked both the preferred qualifications. *Id.* PageID#891–92.

Sarah Shockling was selected for this position over Solis because Shockling had preferred qualifications. McLaughlin trans., R 23, PageID#812–13; McLaughlin Aff., R. 23-1, PageID#892. Shockling, who held a master's in physician assistant studies, had over two years of experience as an Advanced Practice Provider and had completed a clinical rotation in vascular surgery at Johns Hopkins Hospital. McLaughlin trans. Ex. 4, R. 23-1, PageID#897. In contrast, Solis had no experience as a nurse practitioner. McLaughlin trans., R 23, PageID#813; McLaughlin Aff., R. 23-1, PageID#892.

McLaughlin also identified concerns about Solis's ability to promote teamwork and respect her co-workers—one of the job expectations for an Advanced Practice Provider position in vascular surgery. McLaughlin Aff., R. 23-1, PageID#892. McLaughlin had previously observed Solis berating a resident for discharging a patient prior to scheduling a follow-up appointment. OSU is a teaching hospital, and McLaughlin testified that Solis was unprofessional and confrontational in the way she corrected the resident. *Id.* McLaughlin also received negative feedback from other employees regarding Solis's attitude. Dr. Kristin Orion, one of the surgeons

who interviewed Solis, provided interview feedback to McLaughlin expressing reservations about Solis due to her attitude. McLaughlin trans., R. 23, PageID#842–43. Around the time McLaughlin was engaged in the Advanced Practice Provider hiring process, she received "a lot of team complaints about Stephanie [Solis]" from colleagues who "had frustrations working with her, and had expressed that they would not want her as a team member." *Id.* PageID#844–45, 849, 854. Solis admitted that she had been approached in 2019 and 2020 regarding her behavior toward co-workers. Solis trans., R. 24, PageID#1112–16, 1121–26. Despite discussing ways to improve with her colleagues, her response was that she "can't change someone's perception" of her. *Id.* PageID#1128.

After filing this lawsuit, Solis began working part-time as a nurse practitioner for a different employer, OhioHealth, in 2023. *Id.* PageID# 1004–05. Solis took the part-time position at OhioHealth to gain experience as a nurse practitioner and become a more attractive candidate for Advanced Practice Provider positions, and to work the requisite clinical hours to maintain her nurse practitioner certification. *Id.* PageID#1005–06, 1036. Solis still works for OSU part-time as a staff nurse at Ross Heart Hospital. *Id.* PageID#1005, 1008.

IV.   **Solis brought a Title VII claim based on her failure to obtain an Advanced Practice Provider position, and the district court granted summary judgment for OSU.**

In 2022, Solis filed a race discrimination charge against OSU with the Ohio Civil Rights Commission focused on several denials of Advanced Practice Provider positions, including the Cardiology and Vascular Surgery positions at issue here. For at least one of the other Advanced Practice Provider positions raised in her charge, Solis lacked the minimum requirements necessary for the position. Farah Aff., R. 19-1, PageID#350. Solis withdrew her charge six months later and filed this lawsuit. Her complaint alleged that she had unsuccessfully applied for 89 Advanced Practice Provider positions between 2019 and 2022, but she focused only on the Cardiology (R26560) and Vascular Surgery (R46367) positions. *See* Compl., R. 1, PageID#5–7. She provided no allegations detailing the specific requirements for the other Advanced Practice Provider positions, or the qualifications of the successful candidates.

At summary judgment, Solis offered no direct evidence of discrimination. Op., R. 34, PageID#1574. Rather, she testified that no one ever made any comments to her regarding her applications that led her to believe that race was a factor in her failure to obtain an Advanced Practice Provider position. Solis trans., R. 24, PageID#1030–31. Solis never expressed to either of the Advanced Practice Provider managers at the Ross Heart Hospital, or to human resources, that she felt she was

15

not receiving Advanced Practice Provider positions due to her race. *Id.* PageID#1023, 1048. Prior to filing this lawsuit, she never contacted OSU's Office of Institutional Equity to raise concerns about the Advanced Practice Provider application process, or filed any internal complaints with OSU regarding discrimination. *Id.* PageID#1023. And she never utilized OSU's anonymous reporting hotline to file a discrimination complaint. *Id.* PageID#1037–38.

In the absence of direct evidence of discrimination, Solis attempted to prove her case through a combination of statistical evidence and other circumstantial evidence. Solis offered an expert witness's statistical analysis, which purported to show that the number of African American Advanced Practice Providers at OSU was lower than should be expected to a statistically significant degree. Solis's expert reached that conclusion by comparing the percentage of African American Advanced Practice Providers at OSU with the percentage of the total African American population in Columbus and Ohio generally, as well as the percentage of African American Advanced Practice Providers nationwide. Op., R. 34, PageID#1593. The statistical analysis relied on OSU's employee-reported racial data—which is wholly voluntary for employees to report—to determine the percentage of African American Advanced Practice Providers actually employed at the hospital. *Id.* PageID#1594.

16

The district court granted summary judgment for OSU. The parties consented to have summary judgment decided by Magistrate Judge Kimberly Jolson. The Magistrate Judge applied the *McDonnell Douglas* burden-shifting framework and first held that Solis had met the relatively low bar to establish a prima facie case. *Id.* PageID#1576–79. The court then determined that OSU had satisfied its burden to show legitimate, non-discriminatory reasons for its hiring decisions. *Id.* PageID#1579–81. Finally, the court held that Solis had failed her burden to raise a genuine question of fact as to whether those reasons were pretext for racial discrimination. Relying on this Court's precedent, the district court rejected Solis's arguments that OSU's consideration of qualifications in addition to the minimum job requirements, and its minor deviations from its internal recommended hiring guidelines, were sufficient to establish pretext. *Id.* PageID#1585–89.

The district court likewise rejected Solis's statistical evidence as non-probative and insufficient to create a genuine issue of material fact because the analysis was flawed in two respects. First, it depended on unreliable data—voluntary and self-reported race statistics—for its baseline percentage of African American Advanced Practice Providers employed by OSU. *Id.* PageID#1594. Second, "it d[id] not compare the number of African American APPs at OSU to the number of APPs in the relevant labor market"—the "greater Columbus area." *Id.* PageID#1595.

17

Solis then filed this appeal.

## STANDARD OF REVIEW

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Likewise, a "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). This Court reviews a grant of summary judgment *de novo*. *Sandman v. N.Y. Times Co.*, 78 F.4th 319, 328 (6th Cir. 2023).

Courts evaluate Title VII employment discrimination claims under the *McDonnell Douglas* burden-shifting framework. *See Boutros v. Canton Reg. Transit Auth.*, 997 F.2d 198, 202–03 (6th Cir. 1993). Under that framework, the plaintiff first must establish a prima facie case showing the failure to promote was based on racial discrimination. *See id.* The burden then shifts to the defendant to articulate a legitimate basis for its adverse employment decision. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Plaintiff then must show that the proffered reason is pretext for discrimination. *Id.*

"[M]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Lindsay v. Yates*, 578 F.3d 407, 421 (6th Cir. 2009); *see also Allen v. Wal-Mart Stores, Inc.*, 602 F. App'x 617, 621 (6th Cir. 2015) (plaintiff cannot meet her burden for pretext by mere "speculation in the face of documentary proof and deposition testimony").

## SUMMARY OF THE ARGUMENT

The district court correctly held that OSU provided non-discriminatory reasons for its selection of Wade and Shockling over Solis, and that Solis failed to establish a genuine dispute that OSU's legitimate bases for its Advanced Practice Provider hiring decisions were pretext for racial discrimination. Solis does not dispute that the non-discriminatory hiring reasons proffered by OSU are legitimate and objective considerations relevant to this profession. Nor does she dispute that her staff nursing position gave her qualitatively different experience than Wade offered. That should end the inquiry on this prong of the *McDonnell Douglas* framework.

Yet in the absence of any evidence creating a fact question as to OSU's legitimate reasons for hiring Wade, Solis attempts to construct a credibility issue. App. Br. 22. That effort falls flat. The purported discrepancies Solis raises regarding Farah's testimony are largely manufactured. And the one point on which Farah supplemented his testimony—the precise number of African American Advanced

19

Practice Providers employed by OSU—is a minor change that does not bear on Farah's credibility or his testimony regarding OSU's reasons for selecting Wade over Solis.

Solis's attempt to establish a question of fact on pretext is equally ineffective. Solis lacks any direct evidence of discrimination, and thus endeavors to show pretext through a statistics-plus approach. This Court consistently instructs that for statistical evidence to establish pretext for an employment discrimination claim, it must be based on comparable data from the "relevant labor market" and must be paired with additional circumstantial evidence of discrimination towards the plaintiff. Solis fails both requirements. She presented no evidence as to the relevant labor market, and the comparators she did use run contrary to this Court's precedent. Moreover, the purported additional circumstantial evidence she offers is legally insufficient to show pretext.

## ARGUMENT

## I.   There is no dispute of material fact over whether OSU had legitimate, non-discriminatory reasons for selecting another candidate over Solis.

On appeal, Solis cannot—and does not—dispute the key facts: OSU's hiring reasons are legitimate considerations for this profession, and Wade satisfied those considerations in ways that Solis did not. That should end the inquiry on this prong

of the *McDonnell Douglas* framework.  In view of the undisputed facts, Solis's challenge to OSU's non-discriminatory hiring reasons as to Wade is wafer thin.

Absent any affirmative evidence to contradict OSU's proffer of legitimate hiring reasons, Solis strains to find inconsistencies in Farah's testimony that have no bearing on his explanation for OSU's hiring decision.  She further speculates that OSU's reasons were disingenuous.  But "a nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence.  Instead, the nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment."  *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  Solis falls woefully short of that standard.

### A.    It is undisputed that OSU's proffered bases for its hiring decision are legitimate criteria for Advanced Practice Provider positions.

OSU chose Wade over Solis for the Cardiology Advanced Practice Provider position because Wade offered superior experience with left ventricular assist devices and because his nurse practitioner clinical rotations were far more recent than Solis's were.  Solis offers no evidence to dispute that either of these considerations are legitimate, and for good reason.

Unrebutted evidence establishes that the Cardiology Advanced Practice Provider position was on a team that worked with the left ventricular assist device, a

cardiac pump. Farah trans. II, R. 20, PageID#525. It is entirely reasonable for OSU to prefer candidates with extensive experience working with those devices over candidates with little to no experience. *See Flowers v. WestRock Servs., Inc.*, 979 F.;3d 1127, 1131–32 (6th Cir. 2020) ("Who, after all, better understands the relevant field and corresponding skills necessary to succeed than the employer?"). Solis does not disagree. Moreover, in apparent recognition of the validity of that criterion, she argues that she had some experience with left ventricular assist devices. But she does not dispute that Wade's experience with left ventricular assist devices was materially different and far more extensive. Farah testified, and Solis conceded, that Solis worked with *stable* patients who had left ventricular assist devices "for a long time." Farah Decl., R. 25-1, PageID#1426; Solis trans., R. 24, PageID#1171–72. That meant Solis "did nothing to treat LVAD issues." Farah Decl., R. 25-1, PageID#1426. In Solis's words, her patients with left ventricular assist devices have "had their [devices] for a while and they're there for maybe another issue, but not their [devices], so there's no issue with their [devices]." Solis trans., R. 24, PageID#1172.

Wade, in contrast, was assigned to ICU-level patients, post-transplant patients, and post-cardiac surgical patients—"all patients that [he would] deal with on the team that he was hired for." Farah trans. II, R. 20, Page-ID#525. Wade worked with "unstable LVAD patients" and "was identifying issues with the LVAD device

itself and all the corresponding problems associated with patients in a critically ill, life-sustaining situation." Farah Decl., R 25-1, PageID#1426. Solis does not dispute that Wade's experience with left ventricular assist devices was qualitatively distinct from hers, nor can she. While Solis sometimes "floated" on other hospital floors—including the fourth floor, the ICU for cardiac surgery patients, where Wade was stationed—that limited exposure cannot compare to Wade's four-and-a-half years working as a full-time nurse assigned to a cardiac-surgery floor. *See* Solis trans., R. 24, PageID#1172.

Solis also does not dispute that Wade was fresh off his nurse practitioner clinical rotations, which he had completed in early 2021. Nor does Solis dispute that she had finished her nurse practitioner clinical rotations in 2018, three years prior, and had no nurse practitioner experience to refresh her skills and knowledge in the intervening years. It is entirely reasonable that the recency of an applicant's nurse practitioner experience matters when hiring for a nurse practitioner role. An applicant with recent experience "currently ha[s] that process in [the applicant's] muscle memory and [] functionality throughout the day." Farah trans. I, R. 19, PageID#274. And Farah applied that reasonable preference for recent nurse practitioner experience across other Advanced Practice Provider positions, hiring multiple recent nurse practitioner graduates besides Wade. *Id.* PageID#288, 312–13.

Solis points only to testimony from Brea McLaughlin, the Vascular Surgery Advanced Practice Provider manager, who indicated that she had received an email directing that new graduate hires should receive pre-approval.  This does not undermine Farah's reasonable preference for recent nurse practitioner experience. McLaughlin testified that this instruction was not an OSU policy.  McLaughlin trans., R. 23, PageID# 831.  At any rate, there is no evidence that pre-approval was required in 2021, when OSU hired Wade, or that Farah received the same instruction as McLaughlin for his Cardiology Advanced Practice Provider positions.

**B.    Farah was consistent in his explanation of OSU's reasons for selecting another candidate over Solis and had no material discrepancy in his testimony.**

Solis says that the district court should have disregard Farah's testimony based on supposed conflict within that testimony, *see* App. Br. 25, but she identifies only non-existent or immaterial discrepancies.   More specifically, Solis claims that Farah incorrectly testified on (1) his hiring percentage for African American Advanced Practice Providers, (2) the identity of a member of the hiring team, and (3) the number of African American Advanced Practice Providers employed by OSU. App. Br. 7–8.  The first two purported errors are manufactured, and the third represents an immaterial change with no reasonable bearing on Farah's testimony regarding the reasons for hiring Wade.  Farah has been consistent throughout this litigation

24

on the point that matters here—OSU's bases for its hiring decision. Solis's contortion of Farah's testimony does not change that.

*1.* ***Farah's hiring percentage for African American Advanced Practice Providers****.* Solis takes issue with Farah's indication, in response to deposition questioning, that he has "about a 90 percent hire-rate of African Americans that have applied" for Advanced Practice Providers positions. Farah Trans. I, R. 19, PageID#319–20. Solis argues that this is evidence of "Farah's dubious veracity" because this estimate "was, at best, a guess." App. Br. 8. But Farah never presented this figure as anything but an "estimat[e]." Farah Trans. I, R. 19, PageID#319–20, 325. He further qualified that this was not an "exact number. *Id.* PageID#320. Farah even offered "to go back and look that up" if a precise figure was needed. *Id.* PageID#325. In context, nothing about that testimony casts doubt on Farah's credibility; rather, reading the *whole* exchange drives home Farah's transparency.

*2.* ***Hiring team identity****.* Solis also claims Farah "unequivocally testified" that Kineta Bayne, an African American Advanced Practice Provider at OSU, was on his "hiring team," only to later recant that testimony. App. Br. 8. That is incorrect twice over. Farah's testimony about Bayne was always qualified and remained consistent over both his depositions.

At his first deposition, Farah testified that he "believe[s]" Bayne was on the hiring team but qualified that his testimony was "as far as I can remember." *Id.* PageID#285–86. Farah was later asked whether Bayne was "involved in the hiring process for advanced practice providers" generally, and he responded that he "believe[d] she was." *Id.* PageID#328. When asked *specifically* if she *interviewed* candidates for the Advanced Practice Provider position "offered to Daniel Wade," he said she did not and added "[h]onestly, I don't remember." *Id.* PageID#328–29. At his second deposition, Farah confirmed that Bayne had not been an interviewer for the Wade position, but testified that Bayne was still involved in the hiring process as a staff member who "is part of the shadowing that comes in as the next steps, or move forward." Farah trans. II, R. 20, PageID#520. There is no inconsistency.

### 3. *Number of African American Advanced Practice Providers at OSU*.

Lastly, Solis takes issue with updates Farah made regarding the number of African American Advanced Practice Providers employed by OSU. Farah initially identified two African American Advanced Practice Providers in OSU's responses to interrogatories. At his deposition, he identified two additional Advanced Practice Providers, and later identified a total of six Advanced Practice Providers. App. Br. 7–8. This purported discrepancy has no bearing on Farah's credibility for multiple reasons.

At the outset, Farah had no incentive to *under-report* the number of African American Advanced Practice Providers at OSU. If anything, that Farah sua sponte supplemented his earlier testimony reflect either a good-faith mistake in his initial statement or the acquisition of new information—not dishonesty. Further, it is unsurprising that Farah's initial identifications of the African American Advanced Practice Providers at OSU were underestimates, given that this data is employee-reported, and OSU does not mandate disclosure. *See* Solis trans., R. 24, PageID#1189. Finally, nothing about this supposed error—which Farah promptly addressed, *see* App. Br. 8—bears on the legitimate business reasons OSU offered for its decision to hire Wade over Solis. Where a witness's "inconsistencies do not alter the unrefuted evidence" on the material issues, this Court has held that a "district court's decision to disregard" immaterial discrepancies "does not amount to an improper weighing of evidence." *Fogerty v. MGM Grp. Holdings Corp.*, 379 F.3d 348, 355 (6th Cir. 2004); *see also Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998).

One final point. Solis does not dispute on appeal that Farah was consistent in the legitimate, non-discriminatory bases he provided for selecting Wade over Solis—and for good reason. Solis raised this argument in the district court, which soundly rejected it by citing to unrebutted record evidence and this Court's precedent. *See*

Op., R. 34, PageID#1584.  Solis has forfeited this argument on appeal by not raising it in her opening brief.  *See Glennborough Homeowners Ass'n v. USPS*, 21 F.4th 410, 414 (6th Cir. 2021).  At any rate, it would be meritless for the reasons the district court articulated.

### C.  Solis's speculation cannot create a factual dispute as to the legitimacy of the non-discriminatory reasons for OSU's hiring decision.

Solis speculates that OSU's reasons for selecting Wade over Solis are "red herring[s]" and complains that the only evidence for OSU's hiring reasons comes from Farah.  *See* App. Br. 23–24.  That is not a basis for defeating summary judgment.  "[I]t is well-established in" this Court's "case law that a party may not avoid summary judgment by resorting to speculation, conjecture, or fantasy."  *K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (quotations omitted).  Solis offers only guesswork, rather than contrary evidence, and thus has not created a genuine factual issue.

*Left ventricular assist device experience*.  Solis offers a litany of arguments attempting to undermine Farah's primary reason for selecting Wade over Solis; none of them move the needle.  Solis first observes that the job description did not require left ventricular assist device experience, and that Farah's interview spreadsheet did not have notes on candidates' left ventricular assist device experience.  App. Br. 23.  But employers may weigh qualifications and criteria "not expressly articulated in the

job description" when making hiring decisions. *McDaniels v. Plymouth-Canton Cmty. Sch.*, 755 F. App'x 461, 470 (6th Cir. 2018) (citing *Browning v. Dep't of the Army*, 436 F.3d 692, 696–97 (6th Cir. 2006)). And Solis never contests that experience with left ventricular assist device pumps was relevant to the Cardiology Advanced Practice Provider position (R26560). Moreover, Farah explained that this was his first time creating an interview spreadsheet and that it did not incorporate all the interviewers' feedback. Farah trans. II, R. 20, PageID#500, 526. That the incomplete spreadsheet did not include notes specifically recording applicants' experience with left ventricular assist devices does not undermine the evidence that this was a legitimate hiring criterion for this position.

Solis also points to her testimony that the interviewers did not ask her about left ventricular assist device experience, argues that selecting Wade on this ground is pretext because "she too had experience caring for LVAD patients," and claims that Advanced Practice Providers completed left ventricular assist device training after being hired to those positions. App. Br. 23. None of these observations create an issue of fact. Solis's left ventricular assist device experience was evident from her work history as a staff nurse on the fifth floor of Ross Heart Hospital. As explained above at 22–23, given Solis's and Wade's respective roles, Solis's experience with left ventricular assist device was qualitatively different from Wade's experience with

the left ventricular assist device—which Solis does not dispute. And while Ross Heart Hospital's new Advanced Practice Provider hires completed a 2-3 hour left ventricular assist device training during their orientation, as required by the hospital's accreditor (Farah trans. I, R. 19, PageID#276–78), Solis has not explained how this renders the candidates' left ventricular assist device work experience irrelevant to the job.

***Recency of nurse practitioner education***. Solis claims that OSU had a policy that new graduate nurse practitioners had to first be cleared with Advanced Practice Provider directors. App. Br. 24. But, as the district court noted, McLaughlin actually testified that "she was instructed by email (not as part of an official policy)" to obtain preclearance. Op., R. 34, PageID#1583; *accord* McLaughlin trans., R. 23, PageID#831. And "there is no evidence that Farah was given the same instruction for APP Ross Heart, nor does McLaughlin's testimony indicate that hiring managers were forbidden to hire new APPs or recent graduates." Op., R. 34, PageID#1583. Regardless, it is unclear how this contradicts Farah's testimony that Wade's recent nurse practitioner clinical rotations was one advantage over Solis, who had no nurse practitioner experience in the several years since her clinical rotations.

Solis also suggests that because none of the other new nurse practitioner graduates were advanced to second-round interviews, this reason for selecting Wade

must not be a legitimate consideration.  But the fact that other candidates had recent nurse practitioner clinical experience does not mean they were equal to Wade in all respects and does not undermine the legitimacy of this criterion.

In sum, Solis does not present contrary evidence creating an issue of fact as to OSU's legitimate reasons for hiring Wade, nor does she identify a legitimate basis for disregarding Farah's testimony.  This Court should affirm the district court's holding that OSU established legitimate bases for its hiring decision for the Cardiology Advanced Practice Provider position (R26560) and effectively rebutted Solis's prima facie case.

## II.    Plaintiff's statistical analysis is legally insufficient to establish pretext.

### A.    Plaintiff's statistical analysis uses inapplicable comparator data from the general African American populace and nationwide employment statistics.

It is well-established law that a "valid statistical analysis must encompass the relevant labor market." *Kinnard v. Rutherford Cty. Bd. of Educ.*, 109 F. App'x 85, 90–91 (6th Cir. 2004) (quotations omitted); *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977).  The "relevant labor market" may vary from case-to-case, but it should always be keyed to the "qualified applicant pool" for the employer.  *See, e.g., Dean v. City of Shreveport*, 438 F.3d 448, 457 (5th Cir. 2006)

(concluding that "the City [offering statistical evidence] had to show what percentage of its qualified applicant pool was black during that time period").

In other words, plaintiffs must compare apples to apples. That means limiting comparator data to members of the protected class who are qualified for the position—*e.g.*, nurse practitioners, rather than the general populace. *See Hazelwood*, 433 U.S. at 308; *Driggers v. City of Owensboro, Ky.*, 110 F. App'x 499, 509 (6th Cir. 2004) (statistics comparing women on city police force with women in the *workforce* nationwide "fails to compare the gender composition of the police force to the qualified population in the relevant labor market"). And it requires limiting comparator data to the geographic areas from which the employer draws its applicants. *See Alexander v. Loc. 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 406 (6th Cir. 1999) (the district court's "determination of the 'four-county area' as the correct labor pool was not clearly erroneous. … [A]pplicants were exceedingly willing to commute from throughout the area to [the employer]."); *Grano v. Dep't of Dev. of City of Columbus*, 637 F.2d 1073, 1078 (6th Cir. 1980) (statistical evidence insufficient to show sex-based discrimination because it did not include data on qualified women "in the surrounding area"); *Barnes-Staples v. Carnahan*, 88 F.4th 712, 719 (7th Cir. 2023) (where plaintiff challenged hiring practices in a particular region, data on nationwide statistics could "not advance her claim because of its overbroad scope").

This Court has already outlined what constitutes a relevant labor pool in cases alleging discrimination in promotions. In the context of disparate-impact claims—where statistical evidence of discrimination is required—this Court explained that "'the relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group.'" *Grant v. Metro. Gov't of Nashville and Davidson Cty., Tenn.*, 446 F. App'x 737, 741 (6th Cir. 2011) (quoting *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2006)). The same parameter should apply when the same type of statistical evidence is used in direct racial discrimination claims. *See Carnahan*, 88 F.4th at 719 (when individual plaintiffs use statistical evidence, they are simply "using evidence of systemic discrimination to bolster [their] individual claims").

Solis's "evidence falls short of the relevant statistical data that the law requires" for the same reason as that in *Grant*: she "compares the wrong groups of people." 446 F. App'x at 741. "Instead of comparing the employees who actually applied for or were eligible for promotions with those who received them," *id.*, Solis's data focuses on three vastly overbroad and irrelevant comparator groups—the total percentage of the African American *populace* in Columbus, the total percentage of the African American *populace* in Ohio, and the percentage of African

American Advanced Practice Providers *nationwide*. This is far more overbroad than even the labor market proposed by the *Grant* plaintiff, who "constructed a pool consisting of the entire [employer] workforce" rather than just the qualified or actual promotion candidates. *Id.* at 842; *see also N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 585–86 (1979) (rejecting statistical evidence because it "reveal[ed] little if anything about the racial composition of the class of [the defendant's] *job applicants*" and instead focused on percentage of protected class in the same city as defendant (emphasis added)).

Solis suggests that her statistical evidence must be probative because she uses an expert witness to introduce it. App. Br. 26–27. That is not, and cannot be, the law. Statistical evidence "must meet the minimum standards of statistical reliability"—whether introduced by an expert or not. *See Gambill v. Duke Energy Corp.*, 456 F. App'x 578, 587 (6th Cir. 2012); *E.E.O.C. v. Olson's Dairy Queens, Inc.*, 989 F.2d 165, 168 (5th Cir. 1993) ("[T]he usefulness of statistical data in assessing discriminatory practices depends ... on the validity of the basic reference population as the pole star being compared to the work force of the employer." (quotations omitted)).

Invalid data does not transform into probative evidence by wave of an expert's wand. Despite Solis's contrary suggestions, *see* App. Br. 27, *Hopson v.*

*DaimlerChrysler Corp.*, 306 F.3d 427 (6th Cir. 2002), is not to the contrary. *Hopson* does not immunize statistical evidence from validity, relevancy, and probativeness requirements when plaintiffs employ an expert. It merely holds that a statistically significant disparity *may* establish pretext when "coupled with independent circumstantial evidence of discrimination." *Id.* at 437. But for statistical evidence to be valid and probative in the first instance, it must always be based on data from the relevant labor market.

## B.    Plaintiff's statistical analysis depends on voluntary, self-reported data, which Plaintiff admits may be inaccurate.

Solis's statistical evidence is independently flawed because it relies on voluntary, employee-reported data to determine the racial makeup of OSU's Advanced Practice Providers—data Solis has admitted may not accurately represent the actual racial composition of OSU's workforce. Summ. Judgment Opp., R. 29, PageID#1505 n.7 ("Since disclosing race is not mandatory for University job applicants, the accuracy of [Farah's] representation [regarding candidate racial makeup] is uncertain."). Despite acknowledging the incompleteness of that data set, Solis did not independently collect data on the race of Advanced Practice Provides at OSU. This Court rejected similarly flawed statistical evidence in *Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir. 2007), *overruled on other grounds by Gross v. FBL Fin. Servs.*, 557 U.S. 167, 178 n.4 (2009).

The *Blair* plaintiff offered statistical evidence of age discrimination that relied on employer statistics showing the average age of employees at the time they left the company. But that data did not distinguish the employees who voluntarily "retired or resigned from those who were terminated." *Blair*, 505 F.3d at 530 n.12. That was "especially problematic" because the plaintiff also did not "offer a *complete* list of [employees] who were not dismissed" and their respective ages. *Id.* (emphasis added). An unreliable or incomplete input (underlying data) yields an unreliable and non-probative output (statistical disparity).

### C. The proponent of statistical evidence bears the burden of establishing the "relevant labor market," and Plaintiff has not met that burden.

Solis's statistical evidence is non-probative for the additional reason that neither Solis nor her expert establish that any of the comparators used in her statistical analysis represent the "relevant labor market" for African American Advanced Practice Providers that OSU could hire. *See* App. Br. 29. Solis's answer to that shortcoming is to offload her burden—to establish the validity of evidence she introduced to establish an element (pretext) on which she bears the burden of proof—to OSU. *See id.* ("OSU presented no evidence to show that [Solis's statistical comparator] was not accurate."). Solis offers no authority for that remarkable maneuver because there is none.

It is the proponent of a statistical analysis who bears the burden of establishing what constitutes the "relevant labor market." *See Long v. City of Saginaw*, 911 F.2d 1192, 1199 (6th Cir. 1990) (statistical data insufficient to establish discrimination at summary judgment where proponents "failed to define the available 'relevant statistical pool,' or its composition"); *see also Amyette v. Providence Health Sys.*, 388 F. App'x 606, 607 (9th Cir. 2010) (plaintiff "must present specific evidence about relevant labor markets to defeat summary judgment" (quotations omitted)). Solis does not even attempt to carry that burden. She notes that her expert "used the U.S. as the relevant labor market," App. Br. 29, which is partially true; her expert also used the total African American populations in Ohio and Columbus. But Solis never provided any evidence or analysis to the district court explaining *why* any of those populations is correct in this case. Nor does she articulate on appeal why the district court's determination that the relevant labor market for OSU's Advanced Practice Provider positions is the percentage of African American Advanced Practice Providers in the "greater Columbus area" (Op., R. 34, PageID#1595) was incorrect.

Solis separately asserts that "[w]hat constitutes the relevant labor market is a question of fact." App. Br. 29. But it does not follow that summary judgment was inappropriate. To be sure, there may be cases where both parties introduce competing evidence supporting different understandings of the labor market, so as to create

a genuine dispute of fact stemming from statistical evidence. *See Regner v. City of Chi.*, 789 F.2d 534, 536 (7th Cir. 1986). But this is not such a case. Rather, Solis's statistical evidence never gets off the ground because Solis did not introduce any evidence establishing any of her proposed comparators as the relevant labor market for OSU's Advanced Practice Provider positions in the first instance.

### III. Plaintiff's additional circumstantial evidence of discrimination is legally insufficient to establish pretext.

Even if this Court disagreed with the district court and determined that Solis's statistical evidence was valid, it would still need to be paired with "independent circumstantial evidence of discrimination" to establish pretext. *Hopson*, 306 F.3d at 437. Solis does not offer sufficient circumstantial evidence to establish pretext.

*First*, Solis argues that the district court improperly disregarded her evidence that OSU hired white Advanced Practice Provider candidates more quickly than African American candidates. Solis's "evidence" of this consisted of hiring history for three Caucasian Advanced Practice Providers and two African American Advanced Practice Providers at OSU. Summ. Judgment Opp., R. 29, PageID#1512. That sort of statistical evidence is precisely the "simplistic percentage comparison[ ]" with a "small sample size[ ]" that this Court consistently rejects. *Gamble*, 456 F. App'x at 587 (quotations omitted) (statistical evidence using data set of 7 people insufficient to survive summary judgment); *see also Peeples v. City of Detroit*, 891 F.3d 622, 635

(6th Cir. 2018) (data set of 27 people insufficient); *Gault v. Zellerbach*, 1998 WL 898831, at *2 (6th Cir. Dec. 16, 1998) (sample of 6 people insufficient); *Simpson v. Midland-Ross Corp.*, 823 F.d 937, 943 (6th Cir. 1987) (sample of 17 people "suspect").

*Second*, Solis argues that the district court incorrectly held her to a heightened burden of proof regarding her evidence that OSU relied on purportedly subjective hiring criteria.  App. Br. 32.  That is not what the district court did.  Rather, the district court determined that OSU relied primarily on "objective" qualifications in making its hiring decisions, and that any subjective criteria were not significant enough to establish pretext.  Op., R. 34, PageID#1591–92.

Even wholly "[s]ubjective employment evaluations" are "not illegal per se." *Grano*, 699 F.2d 836, 837 (6th Cir. 1983).  "[P]roof of the use of subjective criteria does not, alone, establish a Title VII claim."  *Love v. TVA Bd. of Dir.*, 2008 WL 906115, at *16 (6th Cir. Mar. 31, 2008).  Courts will consider the nature of any subjective criteria and their application.  *Grano*, 699 F.2d at 837.  Here, evidence establishes that the determinative factors in OSU's hiring decision were objective considerations about candidate work experience.  To the extent that any softer considerations, such as candidate temperament, factored into interview assessments, these

39

considerations cannot establish that OSU's process was so subjective as to give rise to an inference of discrimination.

Solis points to interview notes highlighting Solis's and Wade's professionalism and fit for the team as evidence that OSU used subjective criteria in its hiring process. As the district court determined, "this is not a case where Plaintiff's … interview performances were evaluated and compared as a *primary factor* for denying Plaintiff the promotion." Op., R. 34, PageID#1591–92 (emphasis added). Rather, the evidence establishes that OSU selected other applicants over Solis based on objective criteria—critical care experience with left ventricular assist devices and recency of nurse practitioner clinicals (Wade), and Advanced Practice Provider experience (Shockling)—directly relevant to the cardiology and vascular surgery teams with openings.

*Lastly*, Solis references an argument raised in the district court—alleged "minor deviations from [University] policy"—presumably as an additional category of circumstantial evidence. App. Br. 25. Solis spends a single sentence on this point, which simply notes that the district court rejected the argument. *Id.* That is completely insufficient to present the argument on appeal. "To preserve an issue for appellate review, a party must develop its argument in its appellate briefing." *United States v. Loines*, 56 F.4th 1099, 1106 n.4 (6th Cir. 2023). It cannot incorporate by

reference an argument raised in and rejected by the district court without any elaboration in briefing to this Court.  Regardless, the district court explained at length why this argument has no merit.  Op., R. 34, PageID#1585–89.

## CONCLUSION

For these reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

DAVE YOST
Ohio Attorney General
*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record*
KATIE ROSE TALLEY
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Thomas.Gaiser@OhioAGO.gov

*Counsel for Appellee*
  *Ohio State University*
  *Wexner Medical Center*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 8,663 words. *See* Fed. R. App. P. 32(a)(7)(B)(i).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2024, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

# DESIGNATION OF DISTRICT COURT RECORD

Defendant-Appellee, pursuant to Sixth Circuit Rule 30(g), designates the following filings from the district court's electronic records:

### *Solis v. OSU Wexner Medical Center*, Case No. 2:23-cv-01390

| Date Filed | R. No.; PageID# | Document Description |
|---|---|---|
| 4/21/2023 | R. 1; 5–7 | Complaint |
| 11/22/2023 | R. 19; 262–63, 270–89, 312–13, 319–20, 325 | Ajwad Farah Deposition Transcript |
| 11/22/2023 | R. 19-1; 349–52 | Affidavit of Ajwad Farah |
| 11/22/2023 | R. 20; 502–04, 514, 520–26 | Ajwad Farah Deposition Transcript Volume 2 |
| 11/22/2023 | R. 23; 793–94, 798, 812–13, 831, 842–54 | Brea McLaughlin Deposition Transcript |
| 11/22/2023 | R. 23-1; 891–92, 897, 970 | Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories |
| 12/14/2023 | R. 24; 993–1008, 1015, 1023, 1030–31, 1036–38, 1047–48, 1058–59, 1064–67, 1112–16, 1121–28, 1171-72 | Stephanie Solis Deposition Transcript |
| 12/14/2023 | R. 24-26; 1329 | Stephanie Solis Personalized Performance Plan |
| 12/14/2023 | R. 24-29; 1344–45 | Cardiology Advanced Practice Provider Applicants |
| 12/14/2023 | R. 24-37; 1379 | Vascular Surgery Advanced Practice Provider Applicants |
| 12/15/2023 | R. 25-1; 1425–26 | Declaration of Ajwad Farah |

| Date Filed | R. No.; PageID# | Document Description |
|---|---|---|
| 1/5/2024 | R. 29; 1505, 1512 | Response in Opposition to Motion for Summary Judgment |
| 3/7/2024 | R. 34; 1574–95 | Opinion and Order |
| 3/7/2024 | R. 35; 1597 | Judgment |
| 3/18/2024 | R. 36; 1598–99 | Notice of Appeal |